(No. 86898.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONALD BURT, Appellant.

*Opinion filed October 18, 2001.—Rehearing denied December 3, 2001.*

30

HARRISON, C.J., and KILBRIDE, J., dissenting.

Joshua Sachs and Raymond D. Pijon, both of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Michael Bald, State's Attorney, of Freeport (Joel D. Bertocchi, Solicitor General, and William L. Browers, Michael M. Glick and Mary Beth Burns, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Ronald Burt, appeals from an order of the circuit court of Stephenson County dismissing his amended petition for post-conviction relief without an evidentiary hearing. Because defendant was sentenced to death for the underlying murder convictions, the present appeal lies directly to this court. 134 Ill. 2d R. 651(a).

## BACKGROUND

This court has previously set forth the evidence presented at defendant's trial in our opinion on defendant's direct appeal. See *People v. Burt*, 168 Ill. 2d 49 (1995). Therefore, we discuss only those facts and evidence necessary to the disposition of this appeal.

On January 16, 1992, the bodies of H. Steven Roy, age 48, and Kevin Muto, age 18, were found in two separate bedrooms of the farmhouse that Roy rented. Roy and Muto, who had been employed by Roy as a farmhand, had been shot to death.

Defendant was arrested in connection with the deaths on January 17, 1992. Initially, defendant stated that he knew nothing about the crimes. However, after a detective informed defendant that the authorities had gathered information about defendant's involvement in the crimes from Dannie Booth and David Craig, defendant provided a statement.

In his first statement, defendant said that he, Booth

and Craig went to Roy's farm to collect a debt allegedly owed to Booth. While inside Roy's house, defendant pointed a .22-caliber rifle at Roy, demanded his wallet and then ordered Roy to walk to a bedroom. Defendant and Booth followed Roy to the bedroom, while Craig remained in the hallway. Defendant pushed Roy onto a bed. According to defendant, when Roy made a movement, defendant shot him because he was afraid Roy might try to "pull something." Booth then took the rifle and shot Roy several times.

Defendant stated that, after the shooting, he, Booth and Craig took a VCR and meat from Roy's home. While they were taking these items, Muto knocked on the door. When Muto refused to leave, Booth took the gun from defendant and walked Muto to a different bedroom. Booth took Muto's wallet, ordered him to lie on the floor, and shot him in the back of the head and back. Defendant then took the rifle from Booth and shot Muto in the back. Subsequently, the three men left the house with the meat, the VCR, a gun, and some of Roy's personal checks.

On January 18, 1992, defendant provided another statement. This statement was tape-recorded and was similar to defendant's first statement. In this statement, defendant added that, after he shot Roy, he and Craig discussed shooting Booth for fear that Booth would disclose the events surrounding Roy's murder. Upon hearing this, Booth took the rifle from defendant and shot Roy several times. Defendant repeated his assertion that he shot Muto in the back only after Booth had shot him in both the head and back.

On January 24, 1992, six days later, defendant asked to speak to authorities. He then provided a third statement. In this third statement, defendant said that he did not shoot Muto, but rather that Booth was the only person who had shot Muto. Defendant stated that he had admitted to shooting Muto to protect Booth, because Booth was only 14 years old.

On February 5, 1992, defendant was charged with, *inter alia,* two counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 1998)) and armed robbery (720 ILCS 5/18—2(a) (West 1998)) relating to the murders of Roy and Muto. A jury was empaneled to hear the charges in the circuit court of Stephenson County. Prior to defendant's jury trial, the State moved to exclude defendant's third statement, given on January 24, 1992, because, the State argued, it was self-serving hearsay. The trial court granted the State's motion *in limine.* However, both defense counsel and the trial court clarified on the record that the court's decision to exclude the January 24 statement applied only to the trial and not to the potential sentencing stage of the proceeding. Defense counsel did not attempt to introduce the January 24 statement at defendant's sentencing hearing.

Also prior to trial, on July 13, 1992, defense counsel requested that defendant undergo a fitness evaluation. Pursuant to an order of the circuit court, Dr. Donald Pearson, a psychologist, examined defendant and, after administering 14 tests, concluded that defendant was fit to stand trial. Dr. Pearson noted in his report that defendant stated that he was taking the medications Empirin (imipramine), Sinequan and Valium. Defense counsel stipulated to Dr. Pearson's report, and the trial court found defendant fit to stand trial. No other inquiry into fitness was ordered or conducted.

Defendant's case then proceeded to a jury trial on March 23, 1993. On March 26, 1993, just prior to the time that the State indicated it would rest its case and before the presentation of any defense, defendant's attorneys informed the court that, against their advice, defendant wished to change his plea from not guilty to guilty on all charges. The court admonished defendant concerning the consequences of pleading guilty. When defendant persisted in his guilty pleas, the court deter-

mined that, based on the evidence that had been admitted in the proceedings, there was a factual basis to accept the pleas. On March 26, 1993, the court entered judgments of guilty on the counts of first degree murder of Kevin Muto, first degree murder of Steven Roy, and armed robbery.

At a separate sentencing hearing on March 26, 1993, the State sought to prove defendant eligible for the death penalty. The State argued that defendant was eligible for the death penalty because defendant was convicted of murdering two or more individuals (see 720 ILCS 5/9—1(b)(3) (West 1998)) and because defendant killed an individual in the course of another felony (see 720 ILCS 5/9—1(b)(6) (West 1998)), in this case, armed robbery. The jury found defendant eligible for the death penalty only under section 9—1(b)(3), the multiple-murder aggravating factor. 720 ILCS 5/9—1(b)(3) (West 1998).

Subsequently, at defendant's death penalty hearing, the State presented two witnesses in aggravation. The defendant presented seven witnesses in mitigation. Six of those witnesses were family members or friends of defendant, and testified as to his troubled childhood, exposure to family violence, alcohol and drug use and his capacity for kindness. Defendant also presented expert testimony from a clinical psychologist, who concluded that defendant committed the murders while under the influence of an extreme mental or emotional disturbance.

The jury determined that there were no mitigating factors sufficient to preclude imposition of the death penalty. 720 ILCS 5/9—1(g) (West 1998). Defendant moved for a new trial and sentencing hearing, which the trial court denied. On April 1, 1993, defendant was sentenced to death.

On direct appeal, this court affirmed defendant's convictions and sentence. *People v. Burt*, 168 Ill. 2d 49 (1995). Rehearing was denied on December 4, 1994.

Subsequently, the United States Supreme Court denied defendant's petition for *certiorari*. *Burt v. Illinois*, 517 U.S. 1211, 134 L. Ed. 2d 936, 116 S. Ct. 1832 (1996). On January 2, 1996, defendant filed a *pro se* post-conviction petition in the circuit court of Stephenson County. Following the appointment of counsel, defendant filed an amended petition for post-conviction relief on December 29, 1997. The circuit court dismissed defendant's petition for post-conviction relief without an evidentiary hearing.

## ANALYSIS

The Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1998)) provides a remedy for criminal defendants who have suffered a substantial violation of their federal or state constitutional rights during their original trial or sentencing hearing. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). An action for post-conviction relief is not an appeal from the underlying judgment, but rather a collateral attack on trial court proceedings in which a defendant has the burden to establish substantial constitutional violations that have not been and could not have been previously adjudicated. *People v. Johnson*, 191 Ill. 2d 257, 268 (2000). Issues that were decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised on direct appeal, but were not, are waived. *Johnson*, 191 Ill. 2d at 268.

An evidentiary hearing on a post-conviction petition is not a matter of right, but rather is warranted only where the defendant's allegations make a substantial showing that his constitutional rights were violated. *People v. Hobley*, 182 Ill. 2d 404, 427-28 (1998). In determining whether to grant an evidentiary hearing on a post-conviction petition, all well-pled facts in the defendant's petition and any accompanying affidavits are taken as true. *Towns*, 182 Ill. 2d at 503. However, non-factual and nonspecific assertions which merely amount

to conclusions are insufficient to require a hearing under the Post-Conviction Hearing Act. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998).

We review *de novo* a trial court's dismissal of a post-conviction petition without an evidentiary hearing. *Coleman*, 183 Ill. 2d at 389.

## I. Defendant's Fitness

Defendant raises three issues relating to his fitness to stand trial. In his amended post-conviction petition, defendant contended that: (1) he was denied due process of law because throughout the proceedings he was taking psychotropic medications and yet failed to receive a fitness hearing under section 104—21(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 104—21(a)); (2) he was denied effective assistance of counsel when his attorneys failed to request a fitness hearing when they became aware of reasons to doubt his fitness and failed to invoke his mandatory right to a section 104—21(a) fitness hearing; and (3) he was denied due process of law when the circuit court failed to reopen an inquiry into his fitness and conduct a fitness hearing where information known to the court created a *bona fide* doubt as to his fitness.

We will address each of defendant's contentions individually.

### A. *Statutory Right to a Fitness Hearing*

In his opening brief, defendant argues that he was entitled to a mandatory fitness hearing pursuant to section 104—21(a) of the Code of Criminal Procedure (Ill. Rev. Stat. 1991, ch. 38, par. 104—21(a)) because he was taking psychotropic medications from the time of his arrest through sentencing.

At the time of defendant's trial and sentencing, section 104—21(a) of the Code of Criminal Procedure stated:

"A defendant who is receiving psychotropic drugs or

other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." Ill. Rev. Stat. 1991, ch. 38, par. 104—21(a).

In *People v. Nitz*, 173 Ill. 2d 151, 160 (1996), this court held that a defendant may raise in a post-conviction petition that the denial of a section 104—21(a) fitness hearing constitutes a denial of due process. *Nitz*, 173 Ill. 2d at 160. Relying on *People v. Gevas*, 166 Ill. 2d 461 (1995), we determined that the legislature equated a defendant's ingestion of psychotropic drugs with a *bona fide* doubt of his fitness to stand trial. *Nitz*, 173 Ill. 2d at 159, citing *Gevas*, 166 Ill. 2d 461; *People v. Kinkead*, 168 Ill. 2d 394 (1995). Therefore, a defendant could properly claim a due process violation from his failure to receive a section 104—21(a) fitness hearing.

Subsequent to the filing of defendant's initial brief, this court overruled *Nitz* and *Gevas* and held that the court had erred "when it implied[ ] that the legislature equated the administering of psychotropic medication to a defendant with a *bona fide* doubt as to his fitness to stand trial." *People v. Mitchell*, 189 Ill. 2d 312, 331 (2000). *Mitchell* concluded that, because a defendant's right to a section 104—21(a) fitness hearing is statutory, and not constitutional, a defendant has no due process right to a section 104—21(a) fitness hearing. *Mitchell*, 189 Ill. 2d at 337. The failure to receive a section 104—21(a) fitness hearing, therefore, is not a constitutional deprivation and not cognizable in a petition for post-conviction relief unless it is framed in the context of an ineffective assistance of counsel claim. *Mitchell*, 189 Ill. 2d at 337-38.

In his reply brief defendant concedes that, in light of *Mitchell*, he was not denied due process of law for failure to receive a section 104—21(a) fitness hearing merely because he ingested psychotropic drugs. We therefore do not consider that claim.

## B. *Ineffective Assistance of Counsel*

While defendant concedes that he cannot claim a due process of law violation for his failure to receive a section 104—21(a) fitness hearing based solely on his ingestion of psychotropic drugs, he argues that the totality of the circumstances during his trial proceedings established a *bona fide* doubt of his fitness and, therefore, his attorneys were ineffective for failing to request a fitness hearing. As stated, prior to trial, defense counsel requested that defendant be evaluated for fitness and receive a hearing to determine if he was fit to stand trial. Defendant underwent a fitness evaluation by Dr. Donald Pearson, a psychologist, who concluded that defendant was fit. A copy of Dr. Pearson's report was given to the trial court, and defendant's attorneys stipulated to it. When no other evidence regarding defendant's fitness was offered to the trial court, the court determined that defendant was fit to stand trial and that no fitness hearing was necessary.

According to defendant, after the trial court's determination that no fitness hearing was necessary, facts arose which suggested a *bona fide* doubt of his fitness. Defendant offers no evidence to establish that a *bona fide* doubt of his fitness arose prior to the circuit court's determination that a fitness hearing was not necessary. Rather, defendant's argument focuses on circumstances which arose subsequent to that determination.

A defendant is guaranteed the effective assistance of counsel at trial and at a death sentencing hearing. *Strickland v. Washington*, 466 U.S. 668, 686-87, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064 (1984). To establish a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

In order to satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's performance was so seriously deficient as to fall below an

objective standard of reasonableness under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65 (1984). Indeed, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Further, in order for a defendant to establish that he suffered prejudice, he must show a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

"[T]o establish that his trial counsel's alleged incompetency prejudiced him within the meaning of *Strickland*, defendant must show that facts existed at the time of his trial that would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense. Defendant is entitled to relief on this post-conviction claim only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered." *People v. Easley*, 192 Ill. 2d 307, 318-19 (2000), citing *People v. Johnson*, 183 Ill. 2d 176, 193 (1998); *People v. Eddmonds*, 143 Ill. 2d 501, 512-13 (1991). In determining whether a *bona fide* doubt exists as to a defendant's fitness, relevant factors for a court to consider include the defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion on the defendant's competence to stand trial. *Easley*, 192 Ill. 2d at 319.

Defendant offers several arguments in support of his contention that a *bona fide* doubt of his fitness arose dur-

ing the proceedings. First, defendant contends that his decision to change his pleas to guilty midway through trial was irrational and illustrated that his "will had become flattened" and "his desire for self-preservation disappeared." See *Kinkead*, 182 Ill. 2d at 322. Thus, according to defendant, a *bona fide* doubt existed as to his fitness.

As we have discussed, defendant changed his plea to guilty on the fourth day of his jury trial, just prior to the State's resting its case. At this point in the trial, the jury had heard two confessions given by defendant, as well as extensive evidence of his guilt. In light of this, defendant's decision to plead guilty does not appear to be irrational.

Further, defendant's suggestion that his will had become "flattened" and "his desire for self-preservation disappeared" is contradicted by the record. First, it is apparent from the record that defendant disregarded his attorneys' strong advice against a plea of guilty. Before accepting defendant's pleas, the trial judge admonished defendant to carefully consider his attorneys' recommendation against a guilty plea, stating, "I want you to weigh what they advise you very heavily, because they do have the experience of dealing with cases and some knowledge of the law that's related to this, and that's why you have attorneys and that's why the Constitution requires that you be furnished with attorneys ***. Even without their agreement are you still desiring to enter pleas of guilty?" Defendant responded that he did, in fact, wish to enter guilty pleas, despite disagreement on the part of his attorneys. Defendant's decision to plead guilty despite his counsel's recommendation to the contrary shows that his will was not "flattened."

Moreover, the record establishes that defendant did not lose his "desire for self-preservation." Throughout the proceedings, defendant was frequently examined by

Dr. Edward H. Navakas, M.D., a psychiatrist at the Illinois Department of Corrections. In his reports, Dr. Navakas stated that defendant did "appear to feel some grief, but this is quickly shouldered aside in favor of his own needs," that "though [defendant] has not slept recently, he is determined to fight his court battles," that defendant "seems to avoid pain and suffering for himself at almost any cost," and that defendant "appears to be invested in any legal maneuvers that will ensure his survival." Defendant advances no arguments contesting the validity of Dr. Navakas' reports.

In addition, defendant clearly understood the consequences of his guilty pleas. At the time that he pled guilty, the court provided defendant with a detailed explanation as to the proceedings that would follow, both if defendant persisted in his pleas of not guilty and if defendant entered pleas of guilty. Defendant stated that he "underst[ood] fully" that if he pled guilty there would be a conviction on each count and the jury determination would be limited to whether defendant would receive the death penalty or life imprisonment without the possibility of parole. Defendant explained that he was receiving his medication, that he had discussed his guilty pleas with his attorneys and that he understood that his attorneys disagreed with his decision to plead guilty. Finally, defendant stated that he understood the proceedings until that point. Therefore, we conclude that defendant's decision to plead guilty did not illustrate a *bona fide* doubt as to his fitness.

Next, defendant contends that his difficulty concentrating during court proceedings provided reason to doubt his fitness. Defendant provides one example of this alleged difficulty in concentrating in court. During *voir dire*, defense counsel requested a one-day continuance. Counsel stated that defendant felt that, because of his medication and because he was having difficulty sleep-

ing, he could not participate in jury selection that day. Defendant had indicated to counsel that he was "burned out." After confirming that defendant was taking his medications as prescribed and had not required the attention of a doctor, the trial judge denied the request for a continuance. However, the judge noted that he would order a recess if it appeared that defendant was having trouble staying awake. The judge also informed defendant that he could renew his request for a continuance if necessary.

Subsequently, during post-trial proceedings on defendant's motion to withdraw his guilty pleas, the trial judge stated:

"I do recall once and I think it was during jury selection I inquired as to whether the defendant was feeling well, inquired in the proceedings so I did observe him entirely throughout this because there were problems I understood when he was not in the courtroom. There was one outburst at one time in the courtroom and there was one time that he sat for a few moments with his head down and I was concerned that he wasn't feeling well or was not awake even but he indicated he was all right and we could go on.

Other than that I thought he conducted himself very well and very normally throughout the proceedings and certainly felt that he was attentive and if you can be attentive through five days of jury selection I think if you can be attentive to just about anything because that is not the most exciting event in any of our lives but it is an important one and the point of it is also that at all times he was here conferring with counsel, counsel were advising him and conferring with him throughout the proceedings. I observed that on a number of occasions and I can't believe that there was any inability on his part to communicate with counsel and understand their communication with him."

We accept the trial court's observation that defendant appeared to be alert in court and participated in his defense. Defendant communicated with his counsel and the court at various times throughout the proceedings

and indicated on several occasions that he understood the proceedings. Defendant's desire to postpone jury selection for one day because he was tired did not raise a *bona fide* doubt as to his fitness.

In support of his argument that a *bona fide* doubt of his fitness existed, defendant also points to an affidavit from one of his trial attorneys. In this affidavit, which is attached to defendant's post-conviction petition, the attorney states that defendant had frequent mood swings, that he demonstrated belligerent or explosive behavior and that he threatened to become violent in the courtroom. Defendant argues that this provides evidence that a *bona fide* doubt as to his fitness arose and that his attorneys should have inquired into his fitness at that time. Again, fitness refers to a defendant's ability to understand the nature of the proceedings and participate in his defense. Our review of the record persuades us that defendant's "mood swings" did not affect his understanding of the proceedings or his ability to participate in his defense. At various times, defendant stated on the record that he was able to follow the proceedings and that he understood the nature of the charges alleged in his indictment. The record is also replete with instances of discussions between defendant's counsel and the court indicating that counsel was communicating with defendant. For example, on one occasion, defendant clarified a confusion between his counsel and the court as to the circumstances surrounding his confessions. Specifically, during a pretrial motion to suppress the statements in which he confessed to shooting Roy and Muto, defendant provided the title and the police department of the law enforcement officer who took those statements. Accordingly, even accepting that defendant's behavior was at times "belligerent," this does not suggest any impairment in his ability to understand the nature of the proceedings or participate in his defense.

In support of his petition for post-conviction relief, defendant has attached a report from Dr. Lyle Rossiter, a forensic psychiatrist. Dr. Rossiter offers no new evidence. Rather, his report is based on a review of the record in this case. He states that, in his view, a fitness determination was indicated due to defendant's psychiatric history and use of psychotropic medications. Defendant argues that Dr. Rossiter's conclusion stands "unrebutted."

It is for this court, and not Dr. Rossiter, to determine whether there existed a *bona fide* doubt of defendant's fitness. We have reviewed the proceedings in this case and conclude that defendant has not demonstrated that, at the time of his trial, a *bona fide* doubt existed as to his ability to understand the nature and purpose of the proceedings and to assist in his defense. Therefore, we hold that defendant has failed to establish that he suffered prejudice under *Strickland* for his attorneys' failure to reopen an inquiry into his fitness.

Defendant additionally contends that he received ineffective assistance of counsel because his attorneys failed to invoke his mandatory right to a fitness hearing under section 104—21(a). In order to show that his attorneys were ineffective for failing to request a section 104—21(a) fitness hearing, defendant must show that there is a reasonable probability that, had he received a fitness hearing, he would have been found unfit to stand trial. *Mitchell*, 189 Ill. 2d at 338. We have held that no *bona fide* doubt existed as to defendant's fitness at any time during the proceedings. Because there was no *bona fide* doubt of defendant's fitness, defendant cannot establish a reasonable probability that he would have been found unfit to stand trial had he received a fitness hearing. Defendant has failed to meet the prejudice prong required by *Strickland*. We therefore reject defendant's ineffective assistance of counsel claim on this issue.

C. *Circuit Court's Failure to Reopen Fitness Inquiry*

In a related argument, defendant claims that his due

process rights were violated because the circuit court failed to reopen an inquiry into his fitness after its initial determination that no fitness hearing was necessary. Defendant claims that information came to the court's attention during subsequent proceedings which created a *bona fide* doubt as to defendant's fitness and which obligated the court to, *sua sponte*, reopen the issue of his fitness. Defendant offers the same facts and arguments in support of this claim that he offered in support of his ineffective assistance of counsel claim.

Because we have held that there was no *bona fide* doubt of defendant's fitness to stand trial, the trial court did not err in failing to reopen a fitness inquiry. Nothing arose during the course of the proceedings that suggested a *bona fide* doubt of defendant's fitness. Therefore, we hold that the circuit court did not err in dismissing defendant's petition for post-conviction relief with respect to this claim.

## II. *Brady* Claim

Defendant next contends that his due process rights were violated when the State failed to disclose material evidence in mitigation. Defendant argues that the State's failure to disclose testimony by Craig, one of the codefendants involved in the murders, constituted a violation under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

Defendant was sentenced to death on April 1, 1993. On May 5, 1993, at Booth's sentencing hearing, Craig testified for the State that:

"We did indeed go down to the basement, began taking meat out of the freezer. There was a knock on the door, which was Mr. Muto. Dannie was the one who answered the door, invited Mr. Muto in, and he said Steve is sleeping, does not want to be bothered. Burt went upstairs, said something. 'Hi. You're just in time for a picnic. What's your name? Did you say your prayers?' I was in the basement. I heard a gun fire. I heard another one. I go to the

bottom of the basement steps. I see Burt looking down at me, Mr. Ron Burt, looking down at me. I hear another gun fire. I get to the middle of the stairs. I hear another gun fire. Get to the top of the stairs, Burt is turning the corner going towards the bedroom where Dannie and Mr. Muto were. Dannie had handed Ron Burt a .22 rifle, and Mr. Burt ran across the front of the living room and approached me at the front door as I was trying to leave. He had gave [sic] Dannie the gun. He picked up a double-barrel and told me he would blow my brains out."

On cross-examination, Craig admitted that he had pled guilty to murder and armed robbery, that the State had recommended a sentence of 30 years' imprisonment, and that he was arguing for a lesser sentence. Craig stated that his sentencing hearing was scheduled for the following week. He also admitted that he heard defendant state, "Did you say your prayers this morning? I hope so. You're going to need them." Moreover, Craig was impeached with a prior statement he had given to law enforcement officials which stated that, after defendant spoke to Muto, "it sounded like they went to the back bedroom, and I heard five or six shots spaced apart. I went upstairs and saw Ronny and Dannie walking toward me."

Defendant argues that Craig's testimony was *Brady* evidence that should have been disclosed. According to defendant, because the testimony was consistent with his final custodial statement to the police, it should have been disclosed to the defense and known to the jury that imposed defendant's sentence.

Defendant concedes that Craig's testimony would not have affected his eligibility for a death sentence, because defendant still would have been accountable for the murders of both Roy and Muto. However, according to defendant, Craig's testimony would have "carried great weight in mitigation and might well led [sic] the jury to return a sentence other than death."

The State has a constitutional obligation to disclose

evidence that is both favorable to the accused and "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97; *People v. Sanchez*, 169 Ill. 2d 472, 485-86 (1996). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985); *Sanchez*, 169 Ill. 2d at 486. Therefore, in order to succeed in a *Brady* claim, the defendant must show that: (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) the evidence was either wilfully or inadvertently suppressed by the State; and (3) prejudice ensued to the defendant. *Strickler v. Greene*, 527 U.S. 263, 281-82, 144 L. Ed. 2d 286, 302, 119 S. Ct. 1936, 1948 (1999). Because defendant's *Brady* claim does not satisfy the first of these elements, we reject it.

Even if we assume that Craig's testimony was both known to the State and wilfully or inadvertently suppressed by the State, the testimony is not exculpatory. Craig testified that he, defendant, and apparently Booth were in the basement of Roy's home when Muto arrived at the door. After Muto's arrival, both Booth, and later defendant, went upstairs and spoke to Muto. Next, Craig claimed he heard a gun fire two times. Craig stated that after he heard these gunshots, he went to the bottom of the basement stairs and saw defendant at the top of the stairs. At that point, Craig heard two more gunshots.

Craig's testimony does not disprove the State's claim that defendant shot Muto. According to Craig's testimony, he did not see defendant until after he heard two shots fired. In fact, the testimony was more detrimental than helpful to defendant, as Craig stated that defendant *threatened* Muto immediately prior to his murder.

Because Craig's testimony was not exculpatory to defendant, we hold that no *Brady* violation occurred in the case at bar. Accordingly, defendant is not entitled to post-conviction relief with respect to this claim.

### III. Failure to Introduce Mitigation Evidence

In his final argument, defendant contends that his trial counsel was ineffective for failing to attempt to introduce in mitigation at defendant's sentencing hearing the statement given by defendant to police on January 24, 1992. As discussed earlier in this opinion, in the January 24, 1992, statement, defendant claimed that he did not shoot Muto. The State successfully argued the inadmissability of that statement at the guilt phase of defendant's trial. However, the trial court advised defense counsel that any objection to that ruling could be renewed at the sentencing hearing. Defendant argues that his counsel's failure to attempt to introduce this statement at the sentencing hearing constituted ineffective assistance of counsel.

We have considered and rejected this argument on defendant's direct appeal. *Burt*, 168 Ill. 2d at 75-77. As such, principles of *res judicata* bar reconsideration of this issue, and we therefore decline to address it.

### CONCLUSION

In light of the foregoing, we affirm the circuit court's judgment dismissing without an evidentiary hearing defendant's amended petition for post-conviction relief. We direct the clerk of this court to enter an order setting Thursday, January 17, 2002, as the date on which the sentence of death entered by the circuit court of Stephenson County shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional

Center, and the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

The majority's attempt to find sanity in Burt's insistence on pleading guilty illustrates why our system of capital punishment has fallen into such disrepute. Demanding to enter an open guilty plea in the middle of a trial, over counsel's objections, where the State is seeking the death penalty and the nature of the underlying charges is such that death eligibility is certain, is an inherently irrational act. It is tantamount to requesting an immediate death warrant. It is something no clear thinking person would ever do. Once trial was underway, a clear thinking person would heed his lawyer's advice, recognize that he had nothing to lose, and take his chances with the jury. At a minimum, he would attempt to extract some kind of concessions from the prosecution in exchange for his plea, including an agreement to forgo the death penalty.

Burt did none of that. It is interesting that the majority's disposition leaves out why. This is not a situation where the defendant searched his soul and abandoned his defense because he knew he was guilty and wanted to make a swift peace with his maker. Apparently, Burt just wanted to take a smoke. This is no exaggeration. According to one of Burt's attorneys, Burt's abrupt decision to change his plea from not guilty to guilty was motivated by his desire to leave the county jail, where smoking was banned, and return to the Department of Corrections, where smoking was permitted.

Considering Burt's psychiatric history, low IQ, brain impairment and drug addiction, there is a real question as to whether he ever possessed the ability to think rationally. There can be no real doubt, however, that

whatever decisionmaking sense he possessed abandoned him during trial. Burt suffered from frequent mood swings, he complained of feeling "burned out," he feared snakes in his cell and reported hearing voices in his head. He became belligerent, and he ingested large doses of psychotropic medication throughout the period between his arrest and sentencing. Something was clearly wrong. Under the law in effect at the time, the trial court had a duty to determine what it was (725 ILCS 5/104—11(a), 104—21(a) (West 1992); *People v. Brandon*, 162 Ill. 2d 450, 456 (1994)), but no fitness hearing was ever held.

The majority's efforts to justify that result ring hollow. No matter how artfully the legal precedent is strung together, the fact remains that the capital punishment system failed here as we have seen it fail so often in recent years. It is time to abandon the pretense. History has moved on. The failure of our present system of capital punishment is documented and indisputable. That is why our court is no longer entrusted to have the final say on when men are put to death. It is why the Governor has declared a moratorium on executions.

The issue our court should consider now is what to do next. The court has enacted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), I believe that the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and should be applied to all capital cases now coming before us. Because Burt was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Burt were not entitled to the benefit of the

new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Burt's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1998). Because he was convicted of murdering more than one victim, the term of imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1998).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I agree with Chief Justice Harrison that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, the new rules should be applied retroactively to all capital defendants' direct and post-conviction appeals.

The case at hand presents a number of examples of why all capital defendants must have the benefit of the new rules. First, without casting any aspersions upon defendant's trial attorneys, the two court-appointed attorneys had no prior capital litigation experience. The attorneys readily acknowledged their lack of experience

and requested that the trial court relieve them of their appointments. Second, the attorneys also conceded their lack of knowledge of the Illinois statutory provisions providing for fitness hearings for defendants taking psychotropic medications. Third, as noted by Chief Justice Harrison, the defendant unexpectedly pled guilty over the objection of counsel, yet there is no explanation of why counsel could not or did not procure any concessions from the State in return for defendant's guilty plea, such as an agreement not to seek the death penalty. See *People v. Burt*, 205 Ill. 2d 28, 41 (2001) (Harrison, C.J., dissenting). Each of these examples is a type of deficiency commonly tolerated under the old system and thoroughly addressed by the new rules. Since defendant was tried, convicted and sentenced to death without the benefit of the new rules, I respectfully dissent.