2021 IL App (1st) 191846-U

FIRST DISTRICT,
FIRST DIVISION
September 13, 2021

No. 1-19-1846

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) | No. 06 CR 13408 |
| KRISTOPHER HORTON, | ) ) ) | Honorable |
| Defendant-Appellant. | ) ) | Patrick Coughlin, Judge Presiding |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pierce concurred in the judgment.
Presiding Justice Hyman specially concurred.

**ORDER**

¶ 1     *Held*:  Defendant's motion for leave to file a third successive postconviction petition was properly denied where he failed to demonstrate prejudice related to his claim pursuant to *Brady v. Maryland*, 474 U.S. 83 (1963).

¶ 2     Defendant Kristopher Horton was convicted of first degree murder and sentenced to 75 years in prison. Defendant appeals the denial of his *pro se* motion for leave to file a third successive postconviction petition, arguing that his petition makes a *prima facie* showing of cause and prejudice required to raise his claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, we affirm.

¶ 3                                BACKGROUND

¶ 4        On April 23, 2006, defendant was attending a block party in Chicago Heights, Illinois. *People v. Horton*, 2021 IL App (1st) 180551, ¶ 3. Defendant and Steven Williams were involved in an altercation that resulted in defendant shooting and killing Williams. *Id.* Defendant was charged with first degree murder and asserted he shot Williams in self-defense. *Id.*

¶ 5        At trial, James Holliday testified that he had prior convictions for unlawful use of a weapon by a felon, delivery of a controlled substance, aggravated discharge of a firearm, and possession of a controlled substance. *Id.* ¶ 5. On the night of April 22, 2006, James Holliday gathered with a large group of people on Brookline Street in Chicago Heights, including his brother, defendant, Williams, and Dasheena Williams. *Id.* Holliday testified that "a little after midnight," defendant's aunt, Fannie May Harris, drove through the crowd toward her house, located four or five houses down the street, "flicking her lights." *Id.* ¶ 6. As she passed, she ran over Williams's foot. *Id.* Williams, Holliday, Dasheena, and a few other people headed over to Harris's house. *Id.*

¶ 6        When they got there, Williams and Harris began arguing. *Id.* ¶ 7. Defendant and his girlfriend, Ebony Boykins, were also there. *Id.* Defendant "started mentioning things about going to get a gun and he'll be back," and he and Boykins got into a car and left. *Id.* Holliday and the others returned to the block party. *Id.*

¶ 7        About 5 to 10 minutes later, Holliday saw defendant and Boykins drive up to Harris's house. *Id.* ¶ 8. They got out of the car and returned to the party on foot. Holliday approached defendant, who "was kind of still angry and saying things like f*** this, f*** that, I'm tired— I'm tired of mother f*** playing games with me and things like that." *Id.* Holliday tried to calm defendant down, but he pulled a gun out of his pocket, cocked it, and said, "It's serious, you

know what I'm saying, I'm for real." *Id.* Holliday responded, "[I]t ain't worth it, don't do it." *Id.* He tried to hold defendant back physically, but defendant "shook out of his coat." *Id.*

¶ 8          Holliday turned away from defendant to talk to Boykins and heard a gunshot. *Id.* ¶ 9. According to Holliday, defendant shot Williams "towards his stomach area." *Id.* At the time he was shot, Williams was standing about 12 feet from defendant and was talking on his phone. *Id.* Williams fell to the ground and said, "You shot me." *Id.* Defendant yelled, "You still talking, you still talking," and fired about three more shots at Williams. *Id.* Then defendant lifted the gun, pointed it around, and screamed, "Anybody can get it, anybody can get it." *Id.* The group in the street scattered. *Id.* Defendant and Boykins returned to their car and drove away. *Id.*

¶ 9          Holliday went to tell Williams's parents what had happened. *Id.* ¶ 10. Holliday's brother and Daniel Logan put Williams in Logan's truck and drove him to the hospital. *Id.* Holliday never saw Williams with a gun that night but acknowledged that he had been drinking vodka since about 5 p.m. and taking Ecstasy. *Id.*

¶ 10          Dasheena testified that at around 5 p.m. she, Williams, and another person went to the block party, where people were drinking, dancing, and walking around. *Id.* ¶ 11. Dasheena had been drinking but was not drunk. *Id.* After "a while," Harris came "flying" down the street in her car, beeping her horn and flashing her lights, and ran over Williams's foot before pulling into her driveway. *Id.*

¶ 11          Williams was not badly hurt but started walking to Harris's house with Dasheena, Holliday, and Holliday's brother for an "apology." *Id.* ¶ 12. When they got there, Harris was standing at the window inside her house and defendant and Boykins were outside. *Id.* Williams asked Harris why she ran over his foot, and Harris cursed in reply. *Id.* Williams and defendant began talking. *Id.* According to Dasheena, Williams was not angry, but defendant was. *Id.*

Defendant "went to go get the gun. [Boykins] was telling him to go get the gun." *Id.* After defendant and Boykins drove off, Dasheena, Holliday, and Holliday's brother walked back to the party. *Id.*

¶ 12    About 20 minutes later, defendant and Boykins returned and pulled up outside Harris's house. *Id.* ¶ 13. Dasheena was about 14 feet away from Williams, who was standing in a driveway, talking on his phone. *Id.* Defendant started walking toward the party. *Id.* Holliday walked up and began talking to defendant and grabbed his coat. *Id.* As defendant squirmed out of his coat, Dasheena saw a gun in his hand. *Id.*

¶ 13    Williams "was still on the phone acting like he didn't see nothing was going on." *Id.* ¶ 14. Defendant "walked up and shot [Williams]," who fell to the ground. *Id.* Defendant shot Williams two more times, waved the gun around, and asked whether anyone else wanted "to get it." *Id.* The crowd scattered. Defendant walked back to his car and drove off with Boykins. *Id.* Two men picked Williams up, placed him in a truck, and drove away. *Id.* Dasheena did not know the "exact time" Harris drove through the crowd but recalled it was "at night." *Id.*

¶ 14    Logan testified that he arrived at the block party between 10 and 11 p.m., "after *** the initial altercation happened," that is, after Williams's "foot got run over." *Id.* ¶ 15. Logan was standing in a driveway about six feet away from Williams, who was talking on his phone and rolling a marijuana cigarette, when he saw defendant and Boykins walking toward them from the direction of Harris's house. *Id.* Holliday tried to calm defendant down, but he continued walking toward Williams. *Id.*

¶ 15    Logan noticed that defendant had a gun. *Id.* ¶ 16. Williams, who was still on the phone, said, "What, you going to shoot me now?" *Id.* Defendant shot Williams in the stomach, and he fell to the ground. *Id.* Defendant swung the gun around and said, "Any of you mother f*** can

get it." *Id.* Defendant then shot Williams two more times. *Id.* Logan went to a neighbor's house, told someone there to call the police, and retrieved his truck. *Id.* He and three or four others placed Williams into the truck and drove him to the hospital because it did not look like he "was going to make it." *Id.*

¶ 16      Logan acknowledged that when he was first interviewed by the police, he gave a false name because he "had a couple of warrants" for "DUI and a possession." *Id.* ¶ 17. Williams seemed angry on the night in question, but Logan never saw anyone other than defendant with a gun. *Id.*

¶ 17      Chicago Heights police detective Tom Rogers interviewed defendant on April 27, 2006, at a police department in Minnesota. *Id.* ¶ 18. In a videotaped statement, defendant indicated that

"[Williams] was still down there talking on his phone and *** he told them like, man, f*** this p*** a*** n*** or some s***, you know what I'm saying. *** I'm like, man, *** I'm tired of this s***. *** So I walk down there and he standing there ***. So I'm like, now what, motherf***. *** All that s*** you're talking and saying s*** now. *** [H]e said something. Then, you know what I'm saying, that's when I shot him."

Defendant added that Williams continued swearing at him after being shot, so he shot him again. *Id.*

¶ 18      Defendant testified that he took his gun with him when he left home the morning of the block party. *Id.* ¶ 20. That evening, there were "pockets" of people all along Brookline Street. *Id.* Over the course of the night, defendant consumed two Ecstasy pills and drank a bottle of cognac. *Id.*

¶ 19      At some point during the evening, Harris drove past a group of people, including Williams, Holliday, and Holliday's brother. *Id.* ¶ 21. After she parked in her driveway, Williams,

Holliday, and Holliday's brother walked over to her house. *Id.* Defendant saw Williams shake his finger in Harris's face and approached to ask what was going on. *Id.* Williams said, "B***, ask your auntie and your b*** what happened." *Id.* Defendant and Williams argued, and Holliday implored Williams to calm down. *Id.* Defendant warned Holliday that his group should leave before Harris called the police. *Id.*

¶ 20    Williams, Holliday, and Holliday's brother headed back down the street. *Id.* ¶ 22. Harris told defendant that Williams was "talking crazy" about his foot. *Id.* Harris and Boykins went into Harris's house. *Id.* Defendant drove by himself to a liquor store about six blocks away. *Id.* At the store, he received a call from Boykins, who sounded nervous and reported that "they" were back at Harris's house. *Id.* Defendant believed "they" meant Williams, Holliday, and Holliday's brother. *Id.*

¶ 21    Defendant drove back to Harris's house and parked on the street. *Id.* ¶ 23. He saw Williams, Holliday, and Holliday's brother in the field next to Harris's house. *Id.* Williams, who was taller and heavier than defendant, was waving his hands. *Id.* Defendant exited his car and started walking toward Holliday to talk to him. *Id.* At this point, defendant saw that Williams was holding a gun and shaking it in an up-and-down motion. *Id.* Williams yelled something to the effect of, "[S]omebody gonna pay for this." *Id.* Defendant thought Williams was talking about receiving money because Harris ran over his foot. *Id.* Holliday told Williams to put the gun away, and he placed it in the small of his back. *Id.*

¶ 22    Defendant, by this time nervous and confused, asked Holliday what was going on. *Id.* ¶ 24. Williams responded, "Somebody gonna pay for this s***" and started walking backwards away from Harris's house. *Id.* Defendant followed, telling Williams, "If you want some money motherf***, a motherf*** will give you some money, man." *Id.* As Williams and defendant

continued to exchange expletives, defendant heard Holliday call his name and looked in his direction. *Id.* When defendant turned back around, Williams was pointing a gun in his face. *Id.* Defendant ducked, grabbed his own gun from his waistband, and fired it three or four times. *Id.* Williams fell to the ground. *Id.*

¶ 23        Defendant ran to his car, drove to a hotel, and eventually took a bus to his uncle's house in Minnesota. *Id.* ¶ 25. A few days later, he and Boykins were arrested in Minnesota. *Id.* They were placed in separate cells, but defendant could hear Boykins crying. *Id.* At some point, Detective Rogers told defendant that several witnesses had made statements implicating him in the shooting. *Id.* Defendant told Rogers his version of the events, but Rogers "told me that was bulls***, and if I don't say what them guys said in their statement, that he was gonna charge [Boykins] with accessory to murder." *Id.* This "shook" defendant, so he agreed to make a videotaped statement. *Id.* In exchange, the police promised to let Boykins go. *Id.*

¶ 24        The jury found defendant guilty of first degree murder and found that he personally discharged a firearm that proximately caused Williams's death. *Id.* ¶ 28. The trial court sentenced defendant to a term of 50 years for the murder and a consecutive 25-year term for personally discharging a firearm that proximately caused Williams's death. *Id.* Defendant's conviction was affirmed on direct appeal. *People v. Horton*, 2012 IL App (1st) 101980-U.

¶ 25        In 2013, defendant filed a *pro se* postconviction petition alleging error by the trial court and ineffective assistance of trial counsel for failing to seek and hold a pretrial fitness hearing. The trial court summarily dismissed the petition, and no appeal was filed.

¶ 26        On June 6, 2014, defendant filed a *pro se* motion for leave to file a successive postconviction petition, alleging ineffective assistance of counsel for failing to move to suppress his inculpatory statement and ineffective assistance of appellate counsel for failing to raise this

claim on direct appeal. The circuit court denied defendant leave to file the successive petition and, on appeal, we granted counsel's motion to withdraw and affirmed. *People v. Horton*, No. 1-15-0624 (2016) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 27     On December 18, 2017, defendant sought leave to file a second successive postconviction petition, raising a claim of actual innocence supported by an affidavit from Damien Hyde. Hyde asserted that on the night of the shooting, Williams contacted him at about 10 p.m. and said to meet him "at the spot where we kept all the guns." Hyde gave Williams a gun and Williams said he was "about to take care of" defendant. Defendant asserted that Hyde's affidavit was newly discovered evidence that would "probably change the result on retrial." The circuit court denied defendant leave to file a second successive postconviction petition. We affirmed on appeal, finding that Hyde's affidavit was cumulative of the evidence presented at trial and that defendant failed to raise " 'the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.' " *Horton*, 2021 IL App (1st) 180551, ¶¶ 43, 52 (quoting *People v. Robinson*, 2020 IL 123849, ¶ 50).

¶ 28     On May 9, 2019, defendant filed a motion for leave to file the instant petition for postconviction relief, alleging that the State failed to disclose a police report with Logan's initial statement to police, which defendant did not discover until he received a response to a Freedom of Information Act (FOIA) request in March 2019. The police report indicated that "witness two" stated he was outside in the driveway of a friend's house about "six houses east of the scene" when he heard approximately six gunshots. "Witness two" heard a "crowd of people [say] 'help him,' so he then got into his girlfriend's cousin's white chevy" and drove to the scene. He put the victim into the vehicle and drove him to St. James Hospital. Defendant claims that "witness two" is Logan and that his initial statement would have "incredibly affected the

credibility of his testimony," "challenged the remaining two key witnesses for the State's eye-witness testimony," and caused the jury to accept his claim that his confession was coerced.

¶ 29 The circuit court denied defendant leave to file his third successive postconviction petition, finding that he "fail[ed] to include any supporting exhibits showing the actual testimony of Logan" and "supporting documentation to show that 'witness #2' is Logan." However, the circuit court stated that if defendant did establish that "witness two" was Logan, he satisfied the first two requirements under *Brady* because the police report would be impeaching, and defendant "was shown all the discovery and the police report was not tendered." Regardless, the court concluded that the evidence was not "material" because even if Logan was impeached, this "does not necessarily mean the jury would have rejected Logan's testimony, let alone have reached a different verdict." The jury could have "easily reached the conclusion that a person trying to avoid arrest on outstanding warrants would minimize the value of the information he could provide to law enforcement in a murder investigation."

¶ 30                                     ANALYSIS

¶ 31 "A postconviction proceeding is a collateral proceeding *** and allows review of constitutional issues that were not, and could not have been, adjudicated on direct appeal." *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). The Post-Conviction Hearing Act (Act) contemplates the filing of only one postconviction petition without leave of court. 725 ILCS 5/122-1(f) (West 2018). While successive petitions for postconviction relief are "highly disfavored," *People v. Bailey*, 2017 IL 121450, ¶ 39, leave of court to file a successive postconviction petition may be granted if defendant satisfies the "cause-and-prejudice" test. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002); 725 ILCS 5/122-1(f). "Cause" is established by "identifying an objective factor that impeded" the "ability to raise a specific claim during ***

initial post-conviction proceedings" and "prejudice" is shown by demonstrating that the claim not raised "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f). Defendant must make a *prima facie* showing of cause and prejudice. *Bailey*, 2017 IL 121450, ¶ 24.

¶ 32        Leave of court to file a successive petition should be denied "when it is clear, from a review of the successive petition and the documentation *** that the claims alleged by the [defendant] fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. We review the denial of defendant's motion for leave to file a successive postconviction petition *de novo*. *Bailey*, 2017 IL 121450, ¶ 13 (citing *People v. Wrice*, 2012 IL 111860, ¶ 50).

¶ 33        Under *Brady*, prosecutors are required to disclose exculpatory evidence to the defendant. *Brady*, 373 U.S. at 87. "A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Jarrett*, 399 Ill. App. 3d 715, 727-28 (2010) (citing *People v. Burt*, 205 Ill. 2d 28, 47 (2001)). Evidence is material if "there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 728 (citing *People v. Harris*, 206 Ill. 2d 293, 311 (2002)). A "reasonable probability" means that "its suppression undermines the confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

¶ 34        In some cases, "cause and prejudice" may "parallel two of the three components of the alleged *Brady* violation." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). "Corresponding to the second *Brady* component (evidence suppressed by the State), a [defendant] shows 'cause' when

the reason for his failure to develop facts in [prior] proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice *** exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 282)).

¶ 35    Defendant argues that he has established "cause" because he did not learn of the undisclosed police report until he received a response to his FOIA request in March 2019 and "prejudice" where "the State's case amounted to a credibility contest between [defendant] and the State's witnesses as to whether [defendant] acted in self-defense."

¶ 36    Even assuming that "witness two" is in fact Logan (*Robinson*, 2020 IL 123849, ¶ 45 ("[a]t the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true")), defendant's claim fails for lack of prejudice because the undisclosed police report is not "material" under *Brady*.

¶ 37    "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012) (citing *United States v. Agurs*, 427 U.S. 97, 112-113, and n. 21 (1976)); see also *People v. Montanez*, 2021 IL App (1st) 191065-U, ¶ 44 (quoting *Smith*, 565 U.S. at 76) (same). Notwithstanding Logan's testimony, Dasheena and Holliday both testified that they saw defendant shoot and kill Williams and neither testified that Williams had pulled a gun on defendant first. Logan's testimony was merely cumulative of Dasheena and Holliday's, and his impeachment would not in any way undercut their credibility. Defendant also admitted in his videotaped statement to detectives that he shot and killed Williams and made no mention of Williams pointing a gun at him or having a gun at any point that night. The jury could have

"credit[ed] the defendant's explicit, detailed statements *** notwithstanding contrary testimony." See *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. Additionally, defendant admitted that he fled the scene immediately after he shot Williams and went to Minnesota. His flight can be "viewed as evidence of consciousness of guilt." *People v. Moore*, 2018 IL App (2d) 160277, ¶ 32 (citing *People v. Harris*, 52 Ill. 2d 558, 561 (1972)).

¶ 38      The overwhelming evidence shows defendant did not act in self-defense and, therefore, the suppressed police report does not undermine the confidence in the verdict. See *Jarrett*, 399 Ill. App. 3d at 728 (defendant failed to establish prejudice required to raise a *Brady* claim where "the evidence demonstrate[d] that defendant and codefendant were the initial aggressors and defendant did not act in self defense"); see also *People v. Green*, 2012 IL App (4th) 101034, ¶ 40 (noting that "even if defendant attempted to impeach [the witness] *** the additional evidence of defendant's guilt demonstrates that the result of his trial would not have been different"). Moreover, Logan's credibility was already called into question when he admitted that he lied to the police, so it is not reasonably probable that further impeachment would have changed the result. See, *e.g.*, *Montanez*, 2021 IL App (1st) 191065-U, ¶ 46 (noting that a pretrial plea deal between the State and witness would have impacted the witness's credibility, but "the materiality of the information is undercut by the fact that defense counsel already challenged [the witness's] credibility at trial").

¶ 39      Defendant asserts that Logan's impeachment would have corroborated the defense's theory that "the three State's witnesses were Stephen Williams's friends, and not [defendant's] friends, who conspired to implicate [defendant] in Williams's murder by falsely claiming that Williams was unarmed." Even if Logan's impeachment would have corroborated this theory, that does not equate to a "reasonable probability" that the outcome of defendant's trial would have

been different, especially where the evidence of defendant's guilt was substantial. See *Strickler*, 527 U.S. at 289 (noting under similar circumstances in a federal *habeas corpus* case, that "[w]ithout a doubt, [the witness'] testimony was prejudicial in the sense that \*\*\* discrediting her testimony might have changed the outcome of the trial" but "[t]hat \*\*\* is not the standard that petitioner must satisfy in order to obtain relief" under *Brady*'s "reasonable probability" test); see also *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); *People v. Morales*, 2019 IL App (1st) 160225, ¶ 36 (quoting *Kyles*, 514 U.S. at 434) (same).

¶ 40    Defendant claims that Hyde's affidavit, attached to his second successive postconviction petition, also supports this argument. In defendant's related appeal, we rejected his assertion that Hyde's affidavit would probably change the result on retrial in the context of an actual innocence claim, and we will not revisit that decision. See *Horton*, 2021 IL App (1st) 180551, ¶¶ 52-53; see also *Green*, 2012 IL App (4th) 101034, ¶ 40 ("[D]efendant could not meet the *Brady* materiality test because, as we explained in rejecting defendant's claim of actual innocence, no reasonable probability exists that the result of his trial would have been different."). Regardless, Hyde's affidavit is not relevant to defendant's *Brady* claim.

¶ 41    Having determined that defendant cannot establish prejudice, we need not address whether he established cause. See *Smith*, 2014 IL 115946, ¶ 37.

¶ 42    For all of the reasons set forth herein, the circuit court properly denied defendant leave to file his third successive postconviction petition.

¶ 43    Affirmed.

¶ 44        PRESIDING JUSTICE HYMAN, specially concurring:

¶ 45         I concur in the majority's judgment and join its reasoning in full. I write separately to explain any perceived inconsistency between my agreement here and my dissent from our recent decision in *People v. Horton*, 2021 IL App (1st) 180551 (*Horton I*).

¶ 46        Most importantly, the State made a fatal litigation decision when it argued against Horton's actual innocence claim in *Horton I*. The State conceded by omission that Hyde's affidavit was newly discovered, material, and noncumulative. *Id.*, ¶ 59 (Hyman, J. dissenting). The State made only one argument—that the affidavit probably would not change the result on retrial in as much as it was inconsistent with the trial evidence. *Id.* Our supreme court recently rejected inconsistency with the trial evidence as a valid basis for denying leave to file a successive postconviction petition based on actual innocence. *Id.*, ¶ 68 (citing *People v. Robinson*, 2020 IL 123849, ¶ 60). Given that our supreme court no longer recognizes as valid the State's basis on which to affirm, in my view, the trial court's denial of leave to file should have been reversed.

¶ 47        Also, a critical factual difference exists between Horton's *Brady* claim and *Horton I*'s actual innocence claim. As the State correctly argues, Logan's contradictory version of events in his initial report to police and his trial testimony, though impeaching, does not damage the credibility of the other eyewitnesses to the shooting. Horton's contrary contention amounts to speculation. For *Horton I's* actual innocence claim, however, Hyde's affidavit provided critical corroboration of Horton's version where there had been none as only Horton testified in his defense.

¶ 48        In light of these differences, it is proper for us to affirm the denial of leave to file Horton's successive postconviction petition raising a *Brady* violation even though we should have reversed his appeal raising actual innocence.