2023 IL App (2d) 230032-U
No. 2-23-0032
Order filed September 26, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-0875 |
| ROBERT J. GOULD, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was not closely balanced; thus, we need not resolve whether there was an error in how the circuit court conducted *voir dire.* Also, the circuit court did not abuse its discretion in admitting the other-crimes evidence. Affirmed.

¶ 2    Defendant, Robert J. Gould, appeals after having been convicted in a jury trial, of 10 counts of predatory criminal sexual assault (720 ILCS 5/11-1.40 (West 2016)), 8 counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1), (3) (2016)), and 3 counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60 (2016)).  He contends that a new trial is warranted because the circuit court

failed to ensure compliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and because the volume of other-crimes evidence introduced at trial was unduly prejudicial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In 2017, defendant was indicted for 10 counts of predatory criminal sexual assault, 8 counts of criminal sexual assault, and 3 counts of aggravated criminal sexual abuse of his children, Ro.G. (born February 7, 1997) and Re.G. (born March 13, 1999). The offenses were all alleged to have occurred between February 7, 2001, and February 6, 2015.

¶ 5      The conduct underlying the charged offenses that involved Ro.G. include: defendant's act of fondling her vagina while spanking her when she was between 5 and 7 years old; defendant's act of rubbing his penis on her face when she was between 4 and 7 years old; defendant's act of rubbing her vagina with his genitals when she was between 15 and 16 years old; and defendant's act of placing his penis in her vagina, at times while holding her down, when she was between 16 and 18 years old.

¶ 6      The conduct underlying the charged offenses that involved Re.G. included: defendant's act of touching her vagina with his hand when she was between 4 and 5 years old; defendant's act of placing his penis in her mouth on or about defendant's birthday each year starting when she was 8 until she was 15 years old; defendant's act of placing his penis in her vagina when she was between 7 and 11 years old; and defendant's act of placing his penis in her anus when she was between 7 and 15 years old.

¶ 7      Pretrial, the State moved to admit evidence of other instances of sexual conduct between defendant and his children. The other-crimes incidents may be grouped into a few categories: (1) sexual misconduct that was relayed to, or witnessed by, another party; (2) instances of force or the threat of force used to gain the complainants' compliance; and (3) several encounters where

defendant groped, fondled, or would grind his genitals into another party. The State sought to admit this evidence to show propensity, motive, intent, identity, absence of mistake or accident, *modus operandi*, and the existence of a common plan or design. Because the allegations spanned over 14 years, the State argued that Ro.G. and Re.G. should be allowed to discuss the uncharged conduct that occurred multiple times per week and the patterns that emerged throughout this time. The State also noted that some of the uncharged acts occurred in Wheeling, at the complainants' grandmother's home. Defendant sought to have the other-crimes evidence excluded, arguing it would be confusing, create a trial within a trial, and be more prejudicial than probative.

¶ 8      After a hearing, the circuit court granted the motion, finding that the uncharged acts were temporally and factually related to the charged offenses and would not unduly prejudice defendant's right to a fair trial. Specifically, the court considered "how likely other-crimes evidence was to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged." The court considered this a "neutral" factor and noted that this was "always an assessment of protecting the due process and constitutional rights of the Defendant to make sure he is afforded a fair trial * * *." Additionally, the court excluded evidence of physical torture extraneous to sexual conduct, which it found was more prejudicial than probative. Defense counsel elected to have a limiting instruction related to this evidence read at the close of trial.

¶ 9      On November 14, 2022, *voir dire* was conducted. During the court's admonishments to the jury pursuant to Rule 431(b), the venire was asked if it understood and accepted various principles of law. One venire member stated only that he understood that, if defendant chose not to testify, it could not be used against him. Another venire member stated only that she understood that defendant was not required to offer any evidence on his own behalf. Both venire members were accepted as jurors.

¶ 10 Thereafter, the case proceeded to trial. The evidence reflected that Re.G., Ro.G., and their siblings lived in Island Lake until about 2013. There was a brief period, prior to moving, that the children lived with their grandmother in Wheeling. Thereafter, the children briefly lived in Woodstock with defendant and their mother, Theresa, and then moved to Nova Scotia, Canada.

¶ 11 Beginning in 2015, Re.G. testified that she began talk therapy, cognitive behavioral therapy (CBT), and dialectic behavioral therapy (DBT) with a trauma counselor in Novia Scotia. Re.G. was diagnosed with major depressive disorder and post-traumatic stress disorder (PTSD). Her symptoms consisted of nightmares, flashbacks, and periods of disassociation. Re.G. reported that she learned the term "disassociate" from therapy, and, to her, it "describes the feeling of not being in your body ***." Re.G. described feeling like she was "floating" above her body or, being able to move and talk but feeling like "[she's] in the back seat of the car, and somebody else is driving."

¶ 12 Re.G. stated that her therapist did not help her recover her memories. She never forgot that defendant "sexually abused and sexually assaulted" her. During therapy, Re.G. wrote on a piece of paper that defendant touched her; however, she never spoke about the sexual abuse with her therapist. This incident was reported to law enforcement, and, on August 18, 2016, Re.G. disclosed to Constable Jennifer Lake that she had been sexually abused. Re.G. told Constable Lake that, unless she relived the memory as if it was reoccurring, it was difficult to recall exactly what happened during periods of disassociation. She had repressed many memories of the abuse.

¶ 13 Re.G. testified that the sexual abuse started when she was 3 years old and continued until she was 15 years old. Re.G. recalled that the abuse began as touching or fondling. Defendant would "grope, fondle, or finger" her in the car. In one instance, Re.G. recalled defendant giving her a bath where he held her underwater until she stopped struggling so defendant could "touch [her] and finger [her]." He would also tickle, fondle, or grope some of Re.G.'s younger siblings in front of

her; however, Re.G. never witnessed any acts with Ro.G. Re.G. was aware of Ro.G.'s allegations against defendant but they did not discuss the details of those allegations. Re.G. only witnessed Ro.G. after she was "very sick," often had blood on her, and would be naked and unresponsive in their shared bedroom.

¶ 14    From the age of 6 or 7 until about the age of 15 or 16, defendant forced Re.G. perform oral sex on him, especially on his birthday (January 1st). This occurred in different places, like her uncle's old bedroom, defendant's shower, and defendant's bedroom. Re.G. also reported that defendant "assaulted" her in his childhood bedroom at her grandmother's house.

¶ 15    Eventually, defendant escalated to vaginal penetration; he never used condoms but ejaculated during all his encounters with Re.G. Re.G. recalled a time where she was wearing a Snoopy nightgown, and defendant came into her bedroom, put his hand over her mouth, pinned her arms, told her to be quiet, pulled her nightgown up, and "raped" her. Re.G. did not know if her siblings were awake during the encounter. Re.G. noted that she experienced pain during this incident that caused her to "dissociate," so, she only remembers waking up, fixing her nightgown and underwear, and going back to sleep. Re.G. discovered blood in her underwear and on her nightgown the next morning, so she told Theresa about this encounter. Theresa stated that it was "probably a bloody nose or a lost tooth." After this encounter, Re.G. reported suicidal ideations.

¶ 16    Re.G. also testified that, on many occasions, defendant used a "dolphin beach towel" to bind her wrists or gag her. Specifically, Re.G. recalled that, when she was 10 or 11 years old, she tried to resist defendant's advances, so, he used the towel to bind her arms and then he vaginally penetrated her. Defendant also threatened to abuse Re.G.'s siblings when she resisted his advances. When Re.G. was 12 or 13 years old, she recalled verbally and physically resisting defendant; during this encounter, he stated that he would harm the "little ones" and that "he would make [her]

watch and then he would kill [her]." Re.G. stopped fighting after this incident. She was never able to stop defendant's advances.

¶ 17    Re.G. also recalled that defendant vaginally penetrated her so many times, especially after she turned 15 years old, that she could not estimate the number of occurrences. She stated that she once tried to count the occurrences but quit after she got to 1157 because it was "too depressing to count anymore." Around the age of 12, Re.G. resisted defendant's sexual conduct by hitting, punching, and biting defendant. Defendant, generally, thought Re.G.'s struggling was funny until she "clawed" his eye. Defendant responded by "d[igging]" the point of kitchen knife into her wrist and stating that he would "make it look like a suicide." Re.G. laughed at defendant, so, he started "strangling" Re.G. until he, eventually, turned her over and "raped" her anally. This is not the only time Re.G. recounted being penetrated anally; she stated that, after she began menstruating, defendant "raped" her anally in his bedroom, in the barn, and the hayloft.

¶ 18    Occasionally, during these encounters with defendant, there were other people in the home. In fact, a few times Theresa walked in on defendant "raping" Re.G. and she did not do anything to stop it. Other times, Theresa would be doing the paper route with one of Re.G.'s siblings and defendant would assault her while Theresa was away. Re.G. experienced increased sexual encounters with defendant on Sundays, because the family was busy before church, and during the summer, because her younger siblings were occupied outside.

¶ 19    Re.G. testified that, in 2014, Ro.G. went through a series of hospitalizations. After Ro.G. was released from the hospital the second time, the family moved to Canada. Eventually, Re.G and her siblings moved in with her aunt and uncle there. The last time Re.G. saw defendant was in 2015.

¶ 20 Ro.G. testified that she also spoke with Nova Scotia police about the "sexual abuse." She stated that these encounters with defendant escalated as she got older. When she was younger, it was common for defendant to bathe the children; Ro.G. stated that defendant touched her vagina during this time. On another occasion, defendant rubbed his penis against Ro.G.'s lips and pushed it in her mouth while they were in the shower. Defendant also touched the children's backs and chests while he put them to bed. Ro.G. recalled that defendant, during a bedtime "assault," told her that it was a "game," she was sleeping, and he would kill her if she told anyone. Ro.G. could not recall the number of times that defendant "inappropriately touched" her, but he did not use a condom, and, over time, she grew concerned about pregnancy.

¶ 21 When Ro.G. was five or six years old, defendant spanked her with a wooden rod before he began touching her vagina with his hand. Defendant told Ro.G. that they were playing a "game" and that they would never play it again, but she could not tell Theresa. Defendant also played a "game" where he tackled Ro.G., touched the side of her breasts, and would grind his clothed genitalia against her. Ro.G. saw this happen to Re.G. and another sibling. In one instance, Theresa overheard this occur and told defendant to get off Ro.G. Ro.G. also believed that sexual abuse was occurring with her other siblings, because she saw defendant touch a sibling's penis and there were many times where she found Re.G. passed out, naked, and on the bedroom floor. She never shared details about her abuse with Re.G.

¶ 22 Ro.G. stated that, as she spent time at her grandmother's house, she became aware that her home life was not "normal," because other families would go to school, had friends, and would not keep secrets. Ro.G., generally, felt safe when she was at her grandmother's house. However, on Mother's Day weekend, when Ro.G. was younger than 12 years old, defendant touched her chest and vagina in the back bedroom at her grandmother's house.

¶ 23    Ro.G. averred that, when she was five years old, defendant first "raped" her by putting his penis in her vagina. One time, he dragged Ro.G. from the laundry room by her hair, started choking her against a wall, ripped her clothes off, and put his penis inside her vagina. There were also many times Ro.G. woke up with defendant on top of her with his penis inside her vagina. He often told her she was sleeping or to go back to sleep. Another time, defendant and Theresa threatened to take Ro.G.'s SAT preparation book away, so, Ro.G. threatened to call child protective services. That night, defendant grabbed Ro.G. from bed, repeatedly slammed her head against the wall, and put his penis in her vagina. After the SAT incident, Ro.G. tried to commit suicide; she was hospitalized at Streamwood Behavioral Center. She did not report the sexual abuse because she was scared that she would not see her siblings again and that defendant would kill her.

¶ 24    After her hospitalization, Ro.G. attended DBT and trauma therapy. She was diagnosed with PTSD and attention-deficit/hyperactivity disorder. She was not taught about nightmares, dreams, or "reliable memories;" instead, she described her memories as "flashes." These "flashbacks" of what happened with defendant occurred when she was scared. Ro.G. also described that she disassociated, or did not feel her body, when she was upset but she has never been able to forget what defendant did to her. The sexual abuse stopped when Ro.G. moved to Nova Scotia. She last saw defendant in June 2015.

¶ 25    Magen Robinson, defendant's neighbor in Island Lake, testified that she spent time with Ro.G. and Re.G. when they played outside with her children. Theresa was normally present when the children were outside playing, and they would "scatter" when other men were present.

¶ 26    Sergeant Michelle Asplund testified that she was assigned to this case, which originated in Canada. The case materials submitted to Asplund identified defendant as a potential suspect. Asplund spoke with defendant at his mother's house in Wheeling on August 16, 2017. Thereafter,

Asplund obtained a warrant for defendant's arrest, however, defendant could not be arrested because he had returned to Canada.

¶ 27    Shelly Pier testified as an expert in the fields of post-traumatic stress, rape trauma syndrome, and child abuse accommodation syndrome. She opined that CBT and DBT are accepted treatment modalities for children who report instances of abuse. Neither of these therapeutic paradigms include "trying to implant memories into a patient." She explained that "dissociation" occurs when a person does not fully experience a traumatic event and, therefore, may not fully recall the details of the event. A "flashback" is a mental and physical reliving of a traumatic event and is not a false memory. Pier has never treated anyone with "false memories;" however, she has treated patients who lied about experiencing abuse. Pier opined that most children do not disclose instances of abuse, especially when the abuser is close to the child; however, if the abuse is disclosed, it may be revealed in bits and pieces. She did not speak with Re.G. or Ro.G., or review any of the materials specific to this case.

¶ 28    Robert Barden was accepted as a defense expert in the areas of memory, memory contamination, adult and child psychology, psychopathology, social science, and standards of care regarding forensic opinions in court. Barden opined that hypnosis, improper questioning, a therapist's ideology, and many forms of psychotherapy "can change memory." He also believed that dissociation and compartmentalized memory theories have been "debunked," but CBT and DBT therapies are not "junk science." Barden also testified that a flashback could be accurate or false depending on the source of the flashback. He opined that studies show that many people who experienced trauma do not have memories that come back in "bits and pieces."

¶ 29    Defendant testified that he moved from the Island Lake home to Woodstock to have more room for his large family and because they wanted to get away from a neighbor who yelled at the

children when they played outside. The children were homeschooled by Theresa, but defendant taught the children Bible lessons.

¶ 30    Around 2011, the family changed churches. Defendant testified that Ro.G. did not like this and started to withdraw from the family. Three years later, defendant decided to move closer to family in Canada because he was not making enough money in Woodstock. That same year, Ro.G. tried to commit suicide and was hospitalized. The family moved shortly after Ro.G. was released from the hospital in March 2015. At this time, defendant was not aware of any sexual assault allegations. By December of 2015, defendant was not allowed contact with Ro.G., and his four youngest children were removed from his care. He was only allowed supervised visits with Re.G. and his other children.

¶ 31    Defendant testified that the alleged sexual acts did not happen and that he never inappropriately touched any member of his family. He bathed the children when they were newborns but stopped as they got older. When the children were older, they stayed with their grandmother in Wheeling for a couple of months; defendant did not stay with the children.

¶ 32    At the close of the case, the jury was instructed as to the other-crimes evidence that was introduced. The circuit court admonished the jury that it could consider evidence of defendant's uncharged conduct only for the limited purpose of his "intent, motive, and absence of mistake." Defendant was found guilty on all counts.

¶ 33    The defense, thereafter, moved for a new trial. That motion was denied. Defendant was subsequently sentenced to eight years' imprisonment on each count of predatory criminal sexual assault, six years' imprisonment on each count of criminal sexual assault, and four years' imprisonment on each count of aggravated criminal sexual abuse. All the sentences are to be served consecutively, except the aggravated-criminal-sexual-abuse counts, which are to be served

concurrently to each other. In total, defendant was sentenced to an aggregate term of 126 years of imprisonment. Thereafter, a timely notice of appeal was filed.

¶ 34                                    II. ANALYSIS

¶ 35     On appeal, defendant argues that a new trial is warranted because the circuit court failed to comply with Rule 431(b), and because the volume of other-crimes evidence, including previously undisclosed evidence, unduly prejudiced him. We reject his claims.

¶ 36     Defendant acknowledges that he failed to preserve his two claims for appellate review; therefore, he asks us to review his first claim for first-prong plain error. Defendant claims that a clear and obvious error occurred. Specifically, he contends, the circuit court failed to comply with Rule 431(b), where it failed to ensure that two potential jurors understood and accepted all four principles enumerated in the rule. Defendant also argues that because this case is closely balanced, he was prejudiced by the error. The State responds that the evidence was not closely balanced. We agree with the State.

¶ 37                                    A. Rule 431(b)

¶ 38     Generally, to preserve an issue for appeal, a defendant must object to an alleged error at trial and raise the error in a post-trial motion. Failure to do either results in forfeiture. *People v. Belknap*, 2014 IL 117094, ¶ 66. However, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), provides that a reviewing court may exercise its discretion and excuse a defendant's procedural default of plain errors. *People v. Clark*, 2016 IL 118845, ¶ 42. There are two instances when it is appropriate to do so: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the

judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). In both instances, the burden of persuasion remains with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 39 We do not need to resolve whether there was an error in how the circuit court conducted *voir dire* if we find that the evidence was not closely balanced. *People v. White*, 2011 IL 109689, ¶ 148. "When it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred." *Id.*

¶ 40 "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. We must assess the evidence on the elements of the offense and any evidence regarding a witness's credibility. *Id.* ¶ 53. This "commonsense assessment" can include an examination of whether: (1) the victims had a motive to lie; (2) other evidence exists to explain the victims' knowledge of sexual acts; and (3) there were statements or testimony corroborating some or all the allegations. *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 36-37. The lack of corroborating physical evidence does not make the evidence closely balanced. *People v. Shum*, 117 Ill. 2d 317, 356 (1987). Evidence may be closely balanced where a case turns on a credibility determination between conflicting testimony. *Sebby*, 2017 IL 119445, ¶¶ 55-63. No credibility contest exists, however, where one party's account is unrefuted, implausible, or corroborated by other evidence. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51; *Olla*, 2018 IL App (2d) 160118, at ¶¶ 35-38 (evidence was not closely balanced where, although defendant denied the victim's allegations, there was some corroboration); *People*

*v. Anderson*, 407 Ill. App. 3d 662, 671 (2011) (evidence was not closely balanced because the jury was not faced with two equally credible versions of events).

¶ 41    While defendant argues that the present case turned on a credibility contest between himself and the complainants, we find there was corroboration between the complainants' accounts and that the evidence showed that they had no motive to lie. Although Re.G. and Ro.G., generally, did not witness any sexual penetration between defendant and the other respective sibling, each complainant similarly described the aftermath of encounters with defendant; separately described a similar escalation of conduct; Ro.G. testified she witnessed defendant rubbing his genitals on Re.G. and another sibling, which corroborated Re.G.'s experiences; Ro.G. witnessed defendant touching the penis of one of her siblings; and it is uncontested that Ro.G. and Re.G. did not discuss their sexual encounters with defendant amongst themselves.

¶ 42    Ro.G. and Re.G. both described a similar escalation of conduct. Defendant first began abusing the children by touching and fondling them, often during bath time. He also frequently abused both children while Theresa was away on her paper route. Over time, defendant's conduct escalated to penetration of each complainant. Both children reported that defendant came into their room at night and vaginally penetrated them. Re.G. recalled being pinned to the bed in her Snoopy nightgown while defendant vaginally penetrated her, and Ro.G. recalled that she was awakened when defendant vaginally penetrated her while her younger siblings were also in the room. Finally, both children recounted that Theresa witnessed some of the sexual contact between the children and defendant, and she did nothing to stop these encounters.

¶ 43    Additionally, both Ro.G. and Re.G. believed that the other had encounters with defendant. Specifically, Ro.G. testified that there were many times where she found Re.G. unconscious, naked, and on their bedroom floor. Similarly, Re.G. testified that there were times that she

discovered that Ro.G. was "very sick," often bloody, naked, and unresponsive on the bedroom floor. Re.G. wrapped Ro.G. in a comforter and carried her into the bathroom, where she would lay on the floor until she became responsive and wanted to shower.

¶ 44    Ro.G. testified that she saw sexual conduct occur between defendant and several children, which further gives context to, and corroborates, the complainants' accounts. In one instance, Ro.G. saw defendant touch a sibling's penis. This is similar to the initial conduct that both Re.G. and Ro.G. experienced with defendant. Further, Ro.G. testified that defendant played "a game" where he tackled Ro.G., touched the side of her breasts, and would grind his clothed genitalia against her. Theresa and the younger children saw this happen to Ro.G., and Ro.G. saw this happen to Re.G. and another sibling. This corroborates Re.G.'s account that defendant pinned her to the wall and would grind his genitals on her, and that defendant played a "game" where he "tickle[d]" the children, but really, he "fondle[d] or grope[d]" the children in front of one another.

¶ 45    While Re.G.'s and Ro.G.'s allegations stand in stark contrast to defendant's denial of the allegations, we are reminded that we must make a commonsense assessment of the evidence. *Sebby*, 2017 IL 119445, ¶ 53. Here, unlike in *Sebby*, there was corroboration between the complainants' allegations. Not only had Ro.G. testified that she witnessed sexual conduct between defendant and several children, Ro.G.'s and Re.G.'s individual accounts were very similar, especially considering their uncontested testimony that they never exchanged details about their respective abuse. Additionally, there is nothing in the record to suggest that either Ro.G. or Re.G. had a motivation to lie; to the contrary, at the time the abuse was reported, the children had not had visitation with defendant or been in his custody for at least a year, so, defendant's perceived influence over the complainants and any perceived threat of harm was diminished. As such, we find there is no credibility contest where Ro.G.'s and Re.G.'s accounts corroborate one another,

the children had no motive to lie, and it is uncontested that the children did not discuss the details of their abuse with one another. Thus, the evidence was not closely balanced for purposes of plain-error analysis. *Olla*, 2018 IL App (2d) 160118, ¶ 36.

¶ 46                                    B. Other-crimes Evidence

¶ 47    Defendant next argues that we should either utilize the plain-error rule or examine whether counsel was ineffective and review whether the circuit court permitted excessive other-crimes evidence to be introduced at trial. Here, defendant focuses on the quantity of other-crimes evidence that was presented to the jury; specifically, that the State introduced "vague and excessive claims of 'rape' and 'inappropriate touching,' " without referencing exact incidents and improperly introduced testimony of previously undisclosed allegations of sexual misconduct with other siblings. He asserts that the aggregate prejudicial effect of this evidence outweighed the evidence's probative value, rendering the trial unfair. Defendant also asserts that he received ineffective assistance of counsel where counsel failed to properly preserve defendant's other-crimes claim by including this issue in a post-trial motion. We disagree.

¶ 48    We will address each issue in turn. The initial step under either prong of the plain-error doctrine is determining whether there was a clear or obvious error at trial. *Piatkowski*, 225 Ill. 2d at 565. We conclude that no clear error occurred. The circuit court did not abuse its discretion in permitting the other-crimes evidence, because the aggregate prejudicial effect of the complainants' testimony as to the uncharged offenses did not outweigh its probative value.

¶ 49    Other-crimes evidence is unquestionably prejudicial to a defendant. Generally, "[e]vidence of collateral crimes for which the defendant is not on trial is inadmissible if relevant merely to establish the defendant's propensity to commit crimes," because there is a significant risk that the other-crimes evidence might prove "too much," rendering a jury inclined to convict the defendant

simply because he or she is a bad person deserving of punishment. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Under certain circumstances, however, the probative value of other-crimes evidence outweighs its prejudicial effect, rendering it admissible. For example, other-crimes evidence may be admissible for limited purposes, such as establishing motive, identity, presence, *modus operandi*, knowledge, intent, common design, or absence of mistake. *Id.*

¶ 50    Moreover, 725 ILCS 5/115-7.3(b) (West 2022), provides that, when a defendant is accused of predatory criminal sexual assault of a child, criminal sexual assault, or aggravated criminal sexual abuse, evidence of the defendant's commission of another such offense may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant. Here, defendant was charged with several counts of aggravated criminal sexual abuse, criminal sexual assault, and predatory criminal sexual assault of a child, all of which are offenses listed in section 115-7.3. Further, as required by the statute, the evidence of uncharged conduct that was admitted involved additional acts of the same offenses, primarily with the same complainants.

¶ 51    Where the other-crimes evidence meets these preliminary statutory requirements, section 115-7.3 permits evidence of a defendant's prior sexual activity with a child complainant to be admitted for any relevant purpose, including the defendant's propensity to commit sex offenses, if: (1) it is relevant; and (2) its probative value is not outweighed by its prejudicial effect. *Id.* at 170-71.

¶ 52    Section 115-7.3 further provides that, in weighing probative value against prejudicial effect, a court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2022). A court should also consider whether the

other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury. See *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006) (other-crimes evidence must not become a focal point of the trial, and the detail and repetition admitted must be narrow to avoid the danger of a trial within a trial). Our supreme court has urged circuit courts "to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Id.* at 186. Here, we conclude that the circuit court engaged in a meaningful analysis of the statutory factors outlined in section 115-7.3.

¶ 53    A circuit court's decision to admit other-crimes evidence will not be reversed unless the court abused its discretion. *Donoho*, 204 Ill. 2d at 182. A circuit court abuses its discretion if the court's determination is unreasonable. *Id.*

¶ 54    Defendant does not dispute that the other-crimes evidence here satisfied section 115-7.3's requirements regarding relevance and probative value, but he argues instead that the volume of evidence created substantial prejudice that outweighed its probative value. Defendant, citing *People v. Cardamone*, 381 Ill. App. 2d 462 (2008), asserts that there are times when the sheer volume of other-crimes evidence renders it unduly prejudicial. *Id.* at 496-97 (finding other-crimes evidence unduly prejudicial where the State, in its prosecution of a gymnastics coach for sexual abuse, introduced as many as 257 incidents of uncharged conduct against 7 alleged victims). Defendant asserts that here, like in *Cardamone*, "the sheer unprecedented volume of prior sex acts" admitted against him constitutes reversible error. We disagree.

¶ 55    *Cardamone* is distinguishable from the present case. *Cardamone* does not stand for the proposition that anytime the evidence of other crimes outnumbers that of the charged incidents, the prejudicial effect renders the other-crimes evidence inadmissible. Instead, *Cardamone*

recognized that section 115-7.3 permits other-crimes evidence to be introduced for substantive purposes and that determining whether the nature and quantity of the evidence is excessive is left to the circuit court's discretion. *Id.* at 489, 497 (noting that "[c]learly, some of the evidence was admissible and it is difficult to determine precisely where to draw the line"). In concluding that the circuit court abused its discretion in *Cardamone*, we noted that it failed to conduct a " 'meaningful assessment of the probative value versus the prejudicial impact of the evidence.' " *Id.* at 497 (quoting *Donoho*, 204 Ill. 2d at 178). The court merely found the evidence was probative and admissible without conducting the necessary balancing test to consider the prejudicial effect.

¶ 56　　Unlike *Cardamone*, the circuit court here conducted a meaningful balancing of the probative value versus the prejudicial impact of the evidence. The circuit court considered all three factors listed in section 115-7.3 when it found that the other-crimes evidence was admissible. First, after reviewing People's exhibit nos. 1 and 2 (synopses of the testimony the State wished to elicit), the court found that there was proximity in time between the charged and uncharged offenses. The court noted that there was a correlation between the events identified in the exhibits and in the motion *in limine* and those listed in the indictments. We conclude that his finding was reasonable, as the uncharged offenses happened during the span of time defendant committed the charged offenses with the named complainants. Accordingly, the probative nature of the uncharged offenses is significant because the uncharged offenses were committed in proximity to the charged offenses.

¶ 57　　Next, the court found there was a factual similarity between the facts set out in the motion *in limine*, the exhibits, and the indictments. We conclude that this finding was reasonable. Ro.G. and Re.G. both described a similar escalation of conduct, ranging from touching and fondling, often while playing a "game" or during bath time, to penetration with each child. This is especially

compelling since both Ro.G. and Re.G. testified, without challenge, that they did not exchange accounts of their interactions with defendant. Both complainants also reported similar instances of vaginal penetration by defendant that occurred after they had gone to bed, and both Ro.G. and Re.G. reported discovering the other after an encounter with defendant.

¶ 58    There was also a strong factual similarity between the charged offenses and the complainants' undisclosed testimony. First, Ro.G. testified that she saw defendant touch her sibling's penis. This is like her own and Re.G.'s testimonies about the charged offenses, which alleged that defendant initiated his sexual conduct with the complainants by touching their genitalia. Additionally, Ro.G. testified that she saw defendant pin Re.G. and another sibling to the ground and rub his genitals on them. This statement provides context for, and corroborates, Re.G.'s account that defendant played a "game" where he "fondle[d] or grope[d]" the children in front of one another, and where he pinned Re.G. to the wall and would grind his genitals on her. Overall, the circuit court's finding that there was a high degree of similarity between the charged and the uncharged acts was not erroneous.

¶ 59    Finally, the court considered "how likely other-crimes evidence was to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged." The court considered this a "neutral" factor. However, the court specifically noted that this was not just a "weighing test" and that it considered that this was "always an assessment of protecting the due process and constitutional rights of the Defendant to make sure he is afforded a fair trial * * *." Having considered the relevant factors and using the *Cardamone* analysis, the court found that the evidence relating to instances of sexual conduct was not so prejudicial as to outweigh its probative value. However, the court did exclude evidence of physical torture extraneous to sexual conduct with the victims, which it found was more prejudicial than probative.

¶ 60    Unlike the court in *Cardamone*, the circuit court here conducted an appropriate balancing of the probative and prejudicial value of the evidence. We note that between People's exhibit no. 2 and the instances of conduct that Ro.G. witnessed with other siblings, less than 20 detailed accounts of uncharged conduct were admitted at trial, which operated to summarize more than 12 years of sexual misconduct allegations between two named complainants. Moreover, the State indicated in its motion *in limine* that it planned to discuss, in some fashion, that the sexual misconduct between defendant and the complainants was reoccurring—sometimes, multiple times per week over more than a decade. Under the specific facts presented in this case, it was not an abuse of discretion to allow Re.G.'s statement (that she was "raped" or "inappropriately touched" more than 1157 times) and Ro.G.'s statement (that she could not quantify the number of times defendant "inappropriately touched" her) at trial, as this testimony reflected the State's claims that defendant's conduct was reoccurring.

¶ 61    We also conclude it was not an abuse of discretion to allow Ro.G. to testify that she witnessed uncharged sexual contact between defendant and her siblings. This testimony was related in time and detail to Ro.G. and Re.G.'s accounts of their abuse by defendant. The evidence did not require the testimony of a third-party witness, which might serve to confuse the jury, because a complainant witnessed the conduct. In fact, Ro.G.'s testimony gave context to, and corroborated, occurrences that Re.G. experienced with defendant. This is especially significant where the record is uncontested that the complainants did not discuss their allegations prior to trial.

¶ 62    Defendant was charged with 21 incidents. The other-crimes incidents at issue here may be grouped into two categories: (1) Ro.G.'s accounts of uncharged conduct with three siblings, and (2) the complainants' discussion regarding the quantity of sexual conduct. While the quantity of other-crimes evidence may have exceeded that of the charged conduct, it certainly was not as

detailed as the acts of uncharged conduct described in *Cardamone*, and it otherwise reflected relevant propensity evidence under section 115-7.3. *Cardamone*, 381 Ill. App. at 466-67, 468-69, 470-72, 474-75, 476-77, 479-81, 482; *People v. Perez*, 2012 IL App (2d) 100865, ¶ 49.

¶ 63     In sum, we reject defendant's argument that the circuit court committed clear and obvious error by admitting "excessive" evidence of uncharged crimes. The circuit court did not err in finding that the prejudicial effect of the evidence did not outweigh its probative value. We note that, in *Cardamone*, the risk of juror confusion was heightened by fact that the case was complex and involved over 15 victims. Here, there were two victims, the issues were not complex, and the volume of other-crimes evidence, while technically greater than that pertaining to the charges, was not excessive. Moreover, unlike the witnesses in *Cardamone*, the complainants did not testify at length about each uncharged instance of conduct; rather, they summarily testified about the quantity of sexual conduct between themselves and defendant, and Ro.G. testified about instances of uncharged conduct that she witnessed.

¶ 64     Because we find no clear and obvious error occurred, we cannot conclude that there was plain error. See *People v. Williams,* 2022 IL App (2d) 200455, ¶ 104 ("If clear or obvious error did not occur, no plain-error analysis is necessary."). Accordingly, we honor the procedural default.

¶ 65     We note that defendant also raises an ineffective-assistance-of-counsel claim arguing that counsel was ineffective for failing to preserve defendant's other-crimes claim in a post-trial motion where the evidence was objected to pretrial. However, because we do not find that the other-crimes testimony was inadmissible (or more prejudicial than probative), there was no prejudice accruing from its admission. In the absence of prejudice, defendant's ineffective-assistance claim based on

the admission of other-crimes evidence fails. *People v. Lear,* 175 Ill. 2d 262, 269 (1997) (a claim of ineffective assistance of counsel may be resolved on either prong alone).

¶ 66                                   III. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 68    Affirm.