2025 IL App (2d) 250048-U
No. 2-25-0048
Order filed December 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-875 |
| | ) | |
| ROBERT J. GOULD, | ) ) | Honorable Tiffany E. Davis |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*: The summary dismissal of defendant's postconviction petition is affirmed where defendant's evidence was not arguably newly discovered and would not arguably place the trial evidence in a different light and undermine confidence in defendant's guilt.

¶ 1   Defendant, Robert J. Gould, appeals the circuit court's order dismissing his first-stage postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). Defendant contends that his wife, Theresa Gould's, affidavit contradicting the victims' testimony detailing allegations of sexual assault is (1) newly-discovered evidence, (2) material and noncumulative, and (3) of such a conclusive character it would probably change the

result on retrial. In response, the State argues that defendant's claim is forfeited, the affidavit is not newly discovered, Theresa's testimony is cumulative, and her statement was not conclusive evidence of defendant's actual innocence. For the following reasons, we affirm.

¶ 2                                      I. BACKGROUND

¶ 3      The facts underlying defendant's conviction, as relevant to the issues raised in his direct appeal, may be found in our prior decision. See *People v. Gould*, 2023 IL App (2d) 230032-U. Therefore, we repeat only those facts here that remain relevant and provide context to the instant appeal.

¶ 4                              A. Trial and Direct Appeal

¶ 5      In 2017, defendant was indicted for 10 counts of predatory criminal sexual assault, 8 counts of criminal sexual assault, and 3 counts of aggravated criminal sexual abuse of his children, Ro.G. (born February 7, 1997) and Re.G. (born March 13, 1999). The offenses were alleged to have occurred between February 7, 2001, and February 6, 2015.

¶ 6      At trial, Re.G. testified that defendant sexually abused her when she was between the ages of 3 and 15 years old. She stated that the abuse began as touching or fondling but, eventually, escalated to penetration. Re.G. recalled several instances of abuse. Namely, she testified that defendant had "grope[d], fondle[d], or finger[ed]" her in the car; defendant forced her to remain underwater during a bath so he could "touch [her] and finger [her]"; defendant had tickled, fondled, or groped some of her siblings in front of her; defendant forced her to perform oral sex on him in her uncle's bedroom, his bedroom, and his shower, especially on his birthdays while she was between the ages of 6 or 7 until she was about 15 or 16 years old; and defendant "assaulted" her in his childhood bedroom at her grandmother's house.

¶ 7    Regarding vaginal penetration, Re.G. recalled that defendant never used condoms but ejaculated during all his encounters with her. Defendant penetrated Re.G. so many times, especially after she turned 15 years old, that she could not estimate the number of occurrences. She once tried to count the occurrences but quit after number 1,157 because it was "too depressing to count anymore." Specifically, Re.G. recalled that, on many occasions, defendant used a "dolphin beach towel" to bind her wrists or gag her while he penetrated her. On one such occasion, when Re.G. was 10 or 11 years old, she tried to resist defendant's advances, so, he bound her arms with the towel and vaginally penetrated her. During this encounter, he also stated that he would harm the "little ones" and that "he would make [her] watch and then he would kill [her]."

¶ 3    Around the age of 12, Re.G. resisted defendant's sexual conduct by hitting, punching, and biting defendant. He responded by "d[igging]" a kitchen knife into her wrist and stating he would "make it look like a suicide." Eventually, he turned Re.G over and "raped" her anally. Re.G. also recounted that, after she began menstruating, defendant "raped" her anally in his bedroom, in the barn, and the hayloft.

¶ 4    Re.G. also recalled an instance where defendant came into her bedroom, put his hand over her mouth, pinned her arms, told her to be quiet, pulled her Snoopy nightgown up, and "raped" her. Re.G. noted that she experienced pain during this incident that caused her to "dissociate," so, she only remembers waking up, fixing her nightgown and underwear, and going back to sleep. Re.G. discovered blood in her underwear and on her nightgown the next morning, so she told her mother, Theresa, about it. Theresa stated that it was "probably a bloody nose or a lost tooth." Re.G. did not know if her siblings witnessed the encounter.

¶ 5    Re.G. testified that, occasionally, people would be home during a sexual encounter with defendant. A few times, Theresa walked in on defendant "raping" Re.G., but she did not intervene.

Other times, Theresa would be out doing the paper route while defendant assaulted her. Re.G. recounted that much of the sexual abuse happened on Sundays and in the summer because the remainder of her family was busy or otherwise occupied. Regarding her siblings, Re.G. had neither witnessed any acts between defendant and Ro.G., nor discussed Ro.G.'s allegations against defendant, despite being aware of those allegations. Re.G. only witnessed Ro.G. after she was "very sick," often had blood on her, and would be naked and unresponsive in their shared bedroom.

¶ 6 Ro.G. also testified at defendant's trial. She could not recall the number of times that defendant "inappropriately touched" her; however, she testified that her encounters with defendant escalated as she got older. Beginning when she was young, it was common for defendant to bathe her; he also used this time to touch her vagina. Ro.G. recalled that, during another bathroom encounter, defendant rubbed his penis against her lips and pushed it in her mouth while they were in the shower. At five years old, defendant first vaginally penetrated Ro.G. with his penis. Then, before age 12, on Mother's Day weekend, defendant touched Ro.G.'s back and chest in her grandmother's back bedroom.

¶ 7 During bedtime, defendant would touch the children's backs and chests. There were many times Ro.G. woke up with defendant on top of her with his penis inside her vagina. Specifically, during a bedtime "assault," defendant told Ro.G. this was a "game," she was sleeping, and he would kill her if she told anyone. Ro.G. also recounted other times defendant played a "game" with her. At five or six years old, defendant spanked Ro.G with a wooden rod and then touched her vagina with his hand. Defendant stated they were playing a "game," and they would never play it again, but she could not tell Theresa. In another "game," defendant would tackle Ro.G., touch the side of her breasts, and grind his clothed genitalia against her. Ro.G. witnessed this happening to Re.G. and another sibling. Ro.G. testified that Theresa even overheard this occur and told

defendant to get off Ro.G. Ro.G. believed that defendant was also sexually abusing her other siblings, because she saw defendant touch a sibling's penis, and there were many times where she found Re.G. passed out, naked, and on the bedroom floor. However, she never shared details about her abuse with Re.G.

¶ 8     Regarding vaginal penetration, Ro.G. recalled a time where defendant dragged her from the laundry room by her hair, started choking her against a wall, ripped her clothes off, and put his penis inside her vagina. Another time, defendant and Theresa threatened to take Ro.G.'s SAT preparation book, so, in response, Ro.G. threatened to call child protective services. That night, defendant took Ro.G. from bed, repeatedly slammed her head against the wall, and put his penis in her vagina.

¶ 9     At trial, defendant testified that the alleged sexual acts did not occur and that he never inappropriately touched any member of his family.

¶ 10     Ultimately, defendant was found guilty on every count. He timely appealed. On appeal, he asserted that he was entitled to a new trial because (1) two potential jurors did not state that they understood and accepted all the *Zehr* principles (*People v. Zehr*, 103 Ill. 2d 472 (1984)), and (2) the volume of other-crimes evidence was unduly prejudicial. Neither error was raised in a post-trial motion. We held that the evidence was not closely balanced and, thus, did not warrant reversal under *Zehr*, and the other-crimes evidence was not unduly prejudicial as it reflected less than 20 accounts of no less than 1157 allegations of abuse, corroborated Ro.G. and Re.G.'s accounts in time and detail, did not confuse the jury, and did not require additional witnesses. *Gould*, 2023 IL App (2d) 230032-U, ¶¶ 45, 62. In sum, we affirmed defendant's convictions and sentences on appeal. *Id.*, ¶ 67.

¶ 11                         B. *Pro se* Postconviction Petition

¶ 12    On October 28, 2024, defendant filed a *pro se* postconviction petition alleging newly discovered evidence of actual innocence. Namely, defendant alleged that testimony from Theresa would likely change the result of his case on retrial. He asserted that Theresa's testimony was newly discovered, despite his knowledge about her testimony at the time of trial, because he could not force his wife to waive her fifth amendment right against self-incrimination. Theresa affirmed that she planned to testify at trial but was "threatened" by the prosecutor that "they would come after me if I did not come to testify."[1] Theresa concluded, "Since they did not come after me, it was a lie." She stated that threat of prosecution prevented her from traveling and testifying on defendant's behalf. Theresa averred that she would have testified at trial, that she had always lived with defendant, Ro.G., and Re.G., and she had never heard or witnessed defendant doing anything inappropriate with Ro.G. or Re.G. She believed that she would have heard or witnessed a sexual encounter had anything occurred.

¶ 13    On January 15, 2025, the circuit court dismissed defendant's *pro se* postconviction petition, finding that Theresa's statement was not newly discovered evidence, as it could have been discovered sooner with due diligence. The court noted that Theresa was both an uncooperative and unavailable witness for trial, as she resided in Canada and was alleging fifth amendment protections. The court stated that Theresa's reluctance to testify was not sufficient to claim fifth amendment privilege because there were no reasonable grounds to fear self-incrimination. Further, the court concluded that Theresa's testimony was admittedly known to defendant at the time of trial and not of such a conclusive character to change the result of the case on retrial, as her

---

[1] The Office of the State Appellate Defender asserts that Theresa's "did not come" language is "obviously a scrivener's error given the other statements in the affidavit."

statements contained "only possible impeachment evidence of a portion of the witness' testimony." Accordingly, the court dismissed the petition at frivolous. This timely appeal followed.

¶ 14                                    II. ANALYSIS

¶ 15    On appeal, defendant contends that the circuit court erred by not advancing his *pro se* postconviction petition to second-stage proceedings, where Theresa's testimony could not have been elicited sooner, even through the exercise of due diligence, as she resided outside the subpoena powers of the State. Defendant also asserts that her testimony was arguably material, noncumulative, and would probably change the result on retrial. In response, the State argues that Theresa's testimony was not new, noncumulative, or of such a conclusive character that it arguably undermines the confidence in defendant's guilt. Additionally, the State asserts that defendant's claim is forfeited, as it should have been raised on direct appeal. We do not conclude that defendant's claim is forfeited; however, his claim would not arguably change the result of his case on retrial.

¶ 16    The Act allows a defendant to collaterally attack his or her conviction if it resulted from a substantial denial of his constitutional rights or where the defendant is alleging actual innocence. 725 ILCS 5/122-1 (West 2024). At the first stage of review, the circuit court reviews the petition independently and determines whether the petition is frivolous or patently without merit. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 27. A petition is considered frivolous "only if the petition has no arguable basis in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11 (2009). Meaning, the petition is based on an indisputably meritless legal theory or fanciful factual allegation. *Id*. at 16. To demonstrate a meritorious petition at the first stage, a defendant need only state the gist of a constitutional argument. This requirement is met if a defendant alleges "enough facts to make out a claim that is arguably constitutional for purposes of invoking the [Post-Conviction Hearing]

Act." *Id.* at 9; see also *People v. White*, 2014 IL App (1st) 130007, ¶ 18. If the petition makes a gist of an actual-innocence claim, it advances to the second stage; conversely, if the circuit court determines that the petition is frivolous and patently without merit, it may summarily dismiss the petition. *Hodges*, 234 Ill. 2d at 10-11. The summary dismissal of a post-conviction petition is reviewed *de novo. Id.* at 9.

¶ 17                                    A. Waiver and Forfeiture

¶ 18    First, the State opines that defendant's claim is forfeited, as it should have been raised on direct appeal. In response, defendant argues that, despite his knowledge of Theresa being a potential witness, the claim is not barred because the substance of Theresa's testimony was not a part of the record on appeal. We agree.

¶ 19    A postconviction proceeding is not a substitute for a direct appeal, rather, it is a collateral attack on a prior conviction and sentence. *People v. Edwards*, 2012 IL 111711, ¶ 21. "The purpose of the post-conviction proceeding is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on direct appeal." *People v. Towns*, 182 Ill. 2d 491, 502 (1998). Accordingly, issues that could have been raised on direct appeal, but were not, are considered waived. 725 ILCS 5/122-3 (West 2024) (stating that "[a]ny claim * * * not raised in the original or an amended petition is waived").

¶ 20    Defendant's actual-innocence claim is not barred by waiver or forfeiture here. As defendant asserts, Thersa's affidavit was not included in the record prior to the filing of his postconviction petition. There was no opportunity for appellate counsel to allege trial counsel's ineffectiveness for failing to call Theresa as a witness because the record at the time of the direct appeal was devoid of information regarding Theresa's testimony. See *People v. Wilson*, 2013 IL App (1st)

112303, ¶¶ 17-18 (finding *res judicata* does not apply, where the relevant witness' testimony was not included in the record prior to the filing the postconviction petition); *People v. Tate*, 2012 IL 112214, ¶ 14 (finding not forfeited the defendant's claims of ineffective assistance for failing to call a witness, where the relevant testimony was not included in the record before filing the postconviction petition). Accordingly, defendant's claim is not barred.

¶ 21                                     B. Actual-Innocence Claim

¶ 22    Regarding actual-innocence claims, a defendant must arguably show that his evidence is "(1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. Defendant asserts that Theresa's affidavit is newly-discovered, noncumulative evidence that would change the result of his case on retrial. In response, the State asserts that Theresa's testimony is not newly discovered, rather it is cumulative of testimony at trial. Additionally, the State argues that Theresa's affidavit fails to undermine the confidence of defendant's guilt.

¶ 23                                     1. *Newly-Discovered Evidence*

¶ 24    Here, defendant asserts that Theresa's affidavit is newly discovered, despite his knowledge at trial of Theresa's potentially favorable testimony. Specifically, defendant asserts that, due to Theresa's unavailability—living outside the subpoena power of Illinois—no due diligence could have compelled her testimony sooner. In response, the State argues that the evidence was not newly discovered because defendant knew about her potential testimony at trial, and she could not allege she was unavailable for fear of self-incrimination. Although we need not determine that defendant's evidence was newly discovered—as defendant's evidence is arguably not so conclusive as to change the result of his case on retrial—we, nonetheless, conclude that defendant's evidence was also not arguably newly discovered.

¶ 25    Newly discovered evidence is defined as, " 'evidence that was unavailable at trial and could not have been discovered sooner through due diligence.' " *People v. Edwards*, 2012 IL 111711, ¶ 34 (quoting *People v. Harris*, 206 Ill. 2d 293, 301 (2002)). A witness' exculpatory affidavit can be considered "newly discovered," despite the defendant's knowledge of his or her testimony at the time of trial, if the witness was unavailable to the defendant. *People v. Parker*, 2012 IL App (1st) 101809, ¶ 83. For example, " 'no amount of diligence c[an] force[] [] codefendants to violate their fifth amendment right to avoid self-incrimination,' " thus, a codefendant's affidavit may constitute newly-discovered evidence, although the codefendant was known to defendant at the time of trial. *Id.* (quoting *People v. Molstad*, 101 Ill. 2d 128, 135 (1984)). As relevant here, the supreme court has held that moving outside the subpoena powers of the State may make a witness unavailable and his or her resulting affidavit "newly discovered," especially where defendant was unaware of the exculpatory testimony at the time of trial, and defendant was unaware that he needed to take steps to subpoena an out-of-state witness.  *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009) (finding that a witness affidavit was newly discovered, where he failed to admit to witnessing the offense and made himself unavailable by moving to Wisconsin); see also *Edwards*, 2012 IL 111711, ¶ 37 (noting that failure to attempt to subpoena a witness or explanation as to why subpoenas were not issued showed a lack of due diligence).

¶ 26    At the time of defendant's trial, Theresa was unavailable as a witness because she lived in Canada. 735 ILCS 35/1 *et seq.* (West 2022) (Uniform Interstate Depositions and Discovery Act; listing the requirements for issuing a foreign subpoena). However, defendant was aware of Theresa's potential testimony at the time of his trial. In fact, a trial date was continued so that Theresa could obtain a new passport to facilitate traveling for defendant's trial. Nonetheless, Theresa did not testify or appear at defendant's trial, and defendant failed to take any steps at the

time of trial to compel her presence. Defendant did not exert any diligence, let alone due diligence, to attempt to subpoena Theresa or otherwise obtain her testimony. Furthermore, there is no evidence in this record explaining why defendant's attorney failed to take steps to secure testimony from Theresa. Accordingly, because defendant knew of Theresa's testimony and failed to arguably demonstrate due diligence in securing her testimony for trial, defendant cannot show that Theresa's affidavit was newly discovered. See *Edwards*, 2012 IL 111711, ¶ 37.

¶ 27                                    2. *Noncumulative*

¶ 28     In addition to being newly discovered, evidence in support of an actual-innocence claim must be material and not merely cumulative of other trial evidence. *Robinson*, 2020 IL 123849, ¶ 47. Here, the State contends that the information in Theresa's affidavit only echoed defendant's testimony at trial. Evidence is material where it is relevant and probative of defendant's innocence, and it is noncumulative where additional information is presented compared to what was before the jury. *People v. Coleman*, 2013 IL 113307, ¶ 96.  Here, Theresa's claims, that she always lived with defendant and the victims, she never heard or witnessed defendant acting inappropriately with the victims, and her belief that she would have witnessed any inappropriate behavior had it occurred, were arguably relevant to and probative of defendant's guilt or innocence. Moreover, her affidavit also arguably corroborates defendant's otherwise uncorroborated defense, primarily by impeaching the victims; therefore, it is arguably noncumulative. See *People v. Sparks*, 393 Ill. App. 3d 878, 886 (2009) (noting that affidavits may not be cumulative, where the defendant and the State's witness presented conflicting versions of the incident at trial, and no other evidence at trial corroborated the defendant's testimony); see also *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 81.

¶ 29                                    3. *Conclusiveness*

¶ 30    Even assuming that the information contained in Theresa's affidavit was arguably newly discovered, material, and noncumulative, we must determine whether it was of such a conclusive character that it would probably change the result on retrial. Defendant argues that Theresa's affidavit conflicts with Ro.G.'s and Re.G.'s testimony that Theresa witnessed sexual encounters between the victims and defendant. In turn, the State argues that Theresa's affidavit is conclusory, contradicted by the record, and merely impeaches some of Ro.G.'s and Re.G.'s testimony but offers no evidence that defendant did not abuse his daughters during the alleged period. We agree. Theresa's affidavit is not arguably so conclusive as to change the verdict on retrial.

¶ 31    In the final step of establishing an actual-innocence claim, a defendant must demonstrate that his evidence is of such a conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. Conclusive evidence is evidence that, when considered with the trial evidence, would probably cause a different result at defendant's trial. *Coleman*, 2013 IL 113307, ¶ 96. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. The evidence need not be entirely dispositive to likely alter the verdict on retrial; rather, the defendant must present evidence that places the trial evidence in a different light and undermines the court's confidence in the defendant's guilt. *Id.*, ¶ 56. Probability is the key to determining whether the court would reach a different result after considering the new and old evidence. *Id.*, ¶ 48. Moreover, mere impeachment evidence typically is not of such conclusive character as to justify postconviction relief. *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49; see also *Ortiz*, 235 Ill. 2d at 335.

¶ 32    Initially, Theresa's statement that, if abuse occurred in her home, she would have witnessed it, and, because she did not witness abuse, nothing occurred, is conclusory and not well-pleaded. Theresa's allegation is not specific or supported by facts. See *People v. Burt*, 205 Ill. 2d 28, 35-36

(2001) (noting that "nonfactual and nonspecific assertions which merely amount to conclusions are insufficient to require a hearing under the Post-Conviction Hearing Act"). Moreover, this portion of Theresa's affidavit is also rebutted by Ro.G.'s and Re.G.'s trial testimony that Theresa was not aware of most instances of abuse because she was not home, on her paper route, elsewhere in the home, or asleep. In fact, Re.G. recounted that a disproportionate amount of sexual abuse happened on Sundays and in the summer because the remainder of her family was busy or otherwise occupied. Thus, Theresa's belief that abuse did not occur because she did not witness it is not well taken. As such, this portion of the affidavit is not arguably conclusive.

¶ 33　While taking the remaining well-pleaded facts contained in Theresa's affidavit as true, we note that the evidence therein is nothing more than impeachment of a *small* portion of Ro.G.'s and Re.G.'s testimony. In fact, very little of Ro.G.'s and Re.G.'s testimony indicated that Theresa witnesses their abuse—seemingly only two allegations were witnessed by Theresa. Nonetheless, Theresa averred that she never heard or witnessed defendant do anything inappropriate to their daughters. This contradicts Re.G.'s testimony that Theresa witnessed defendant "raping" her and failed to intervene, and Ro.G.'s assertion that Theresa witnessed defendant play a "game" where he inappropriately touched Ro.G. and Theresa told defendant to stop. Theresa's affidavit does little to discount the remaining corroborative evidence: Ro.G. and Re.G. both described a similar escalation of conduct; both siblings believed defendant was sexually abusing the other, each recounted similar instances of abuse, and neither discussed their individual accounts of abuse with the other; Ro.G. witnessed Re.G. naked, passed out, and lying on the bedroom floor; Re.G. witnessed Ro.G. when she was "very sick," bleeding, naked, and unresponsive; Ro.G. and Re.G. each saw defendant inappropriately touch another sibling; and both siblings similarly recounted defendant's actions pinning another child down and rubbing his genitalia against them. Theresa's

evidence, taken as true, does not weigh strongly against this evidence previously presented at trial. Accordingly, we conclude that Theresa's affidavit was not "conclusive," in that the evidence contained therein, when considered along with the trial evidence, would not arguably place the trial evidence in a different light and undermine confidence in defendant's guilt. *Robinson*, 2020 IL 123849, ¶ 48. Thus, the trial court did not err in dismissing defendant's petition.

¶ 34                                    III. CONCLUSION

¶ 35     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 36     Affirmed.